IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHREEGI ENTERPRISES, INC.,** | : | |
| **d/b/a/ SHENANDOAH STOP** | : | |
| **SHOP,** | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-15-2232** |
| | : | |
| **vs.** | : | |
| | : | |
| **UNITED STATES OF** | : | **Judge Sylvia H. Rambo** |
| **AMERICA; UNITED STATES** | : | |
| **DEPARTMENT OF** | : | |
| **AGRICULTURE FOOD AND** | : | |
| **NUTRITION SERVICE** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

## I.   Introduction

Plaintiff, Shreegi Enterprises, Inc., d/b/a Shenandoah Stop Shop (hereinafter

"Plaintiff," "Shreegi," or "store"), a convenience store, filed this action against the

defendant, the United States of America ("Defendant"), also naming the United

States Department of Agriculture Food and Nutrition Service ("FNS").  Plaintiff is

challenging FNS's decision to permanently disqualify Shreegi from the

Supplemental Nutrition Assistance Program ("SNAP"), also known as the food

stamp program.

SNAP uses electronic benefit transfer (EBT) cards to deliver benefits. FNS permanently disqualified Shreegi after it determined that Plaintiff had illegally trafficked in SNAP benefits, principally based upon FNS's examination of four suspicious patterns of EBT transactions at the store. It also decided that Shreegi was not entitled to pay a civil money penalty ("CMP") in lieu of permanent disqualification.

Defendant has filed a motion for summary judgment, arguing that FNS's decision was correct and indeed mandated by the law. In opposing summary judgment, Shreegi argues that the shopping habits of its SNAP customers in making their EBT transactions provide an innocent explanation for the patterns. Plaintiff also argues that, in any event, FNS should have imposed a CMP rather than permanent disqualification.

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment. Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law, and is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## III.   Jurisdiction and Scope of Review for a SNAP Disqualification

A store can seek judicial review of a final agency determination permanently disqualifying it from the SNAP by filing a complaint against the United States in federal district court.  7 U.S.C. § 2023(a)(13).  "The suit . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue . . . ."  *Id.* § 2023(a)(15).  "If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence."  *Id.* § 2023(a)(16).  In

light of the trial de novo requirement, the district court is "to examine the entire range of issues raised and not merely to determine whether the administrative findings of the agency are supported by substantial evidence. The court must reach its own factual and legal conclusions and is not limited to matters considered in the administrative proceedings." *Freedman v. Dep't of Agric.*, 926 F.2d 252, 261 (3d Cir. 1991)(citations omitted). "A trial de novo is a trial which is not limited to the administrative record — the plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009)(quoting *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997))(internal quotation marks omitted). "However, de novo review is compatible with a summary judgment disposition if there are no material facts in dispute." *Freedman*, 926 F.2d at 261.

FNS may find a violation or disqualify a store "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system." 7 C.F.R. § 278.6(a). *See also* 7 U.S.C. § 2021(a)(2);. Reliance on EBT transaction data alone is sufficient. *Duchimaza v. United States*, 211 F. Supp. 3d 421, 432-33 (D. Conn. 2016)(quoting *Idias v. United*

*States*, 359 F.3d 695, 698 (4th Cir. 2004)); *Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169, 1182 (D. Haw. 2009)("The Food Stamp Act expressly provides for permanent disqualification of a retail food store using EBT evidence alone to support a finding of trafficking.").

"The burden is placed upon the store owner to prove by a preponderance of the evidence that the violations did not occur." *Kim*, *supra*, 121 F.3d at 1272. *See also White Horse No. 2 v. United States*, No. 11-CV-1538, 2012 WL 1533468, at *2 (D.N.J. Apr. 30, 2012). "[E]ven a single incident of trafficking is enough to justify permanent disqualification." *Rockland Convenience Store v. United States*, No. 10-CV-260, 2011 WL 5120410, at *9 (D.N.H. Oct. 27, 2011)(citing in part *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000)). *See also Ganesh v. United States*, 658 F. App'x 217, 219 (6th Cir. 2016)(nonprecedential)("To survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation.")(internal quotation marks and quoted case omitted).

That even a single incident is enough follows from the statutory language that requires permanent disqualification upon "the first occasion or any subsequent occasion of . . . trafficking," 7 U.S.C. § 2021(b)(3)(B), with an exception for FNS to

exercise discretion to impose a CMP instead if the plaintiff had "an effective policy and program to prevent violations . . . ." *Id.*; *Suuqa Bakaro Grocery v. Dep't of Agric.*, No. 16-CV-254, 2017 WL 3141919, at *3 (D. Me. July 24, 2017).  *See also Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004)("In fact, a store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy.").

The de novo standard of review applies to determine if a violation occurred. *White Horse No. 2, supra,* 2012 WL 1533468, at *2.  A different standard of review applies to determine if the sanction was appropriate.  That standard is whether the sanction was "unwarranted in law or without justification in fact," or was "arbitrary or capricious."  *Affum*, 566 F.3d at 1161 (cited case and internal quotation marks omitted).  See also *Atl. Deli & Grocery v. United States*, No. 10-CV-4363, 2011 WL 2038758, at *5 (D.N.J. May 23, 2011)(standard is whether the sanction "was arbitrary or capricious, *i.e.*, whether it was 'unwarranted in law or without justification in fact'")(quoting *Willy's Grocery v. United States,* 656 F.2d 24, 26 (2d Cir. 1981)).  A sanction "is not arbitrary or capricious if it complies with FNS's own

policy." *Rosario v. United States*, No. 14-CV-907, 2017 WL 4316093, at *2 (D. Conn. Sept. 27, 2017).

The plaintiff has the burden of proof on the sanction issue as well. *White Horse No. 2, supra,* 2012 WL 1533468, at *3. This includes "'the burden of introducing evidence into the record that would allow the Court to conclude that the agency's determination . . . is unwarranted in law or fact.'" *Id.* (quoting *Willy's Grocery*, 656 F.2d at 26). "A complaining party is still entitled to a trial *de novo* to create a factual record on the [agency's] determination not to a impose a civil money penalty in lieu of disqualification, and judicial review of the [agency's] choice of penalty is based on that *de novo* record." *Affum*, 656 F.3d at 1161.

## IV.  <u>Background</u>

### A.  SNAP Transactions and Suspicious Patterns

"EBT cards operate like a debit card." (Doc. 31-1, Declaration of Gilda Torres, section chief of FNS's Retailer Operations Division, ¶ 6). Eligible food items can be purchased by swiping the EBT card through an EBT terminal at the authorized SNAP retailer. (*Id.*). "Upon swiping the EBT card, funds from the SNAP household's account are electronically transferred to the retailer's designated

bank account.  The Government then redeems the benefits by paying the firm the full face value of the benefits."  (*Id.* ¶ 7).  According to Defendant's brief in support of summary judgment, SNAP benefits are distributed to beneficiaries at the beginning of each month.  (Doc. 31, Def.'s Br. in Supp. at ECF p. 11).

"FNS is able to electronically monitor stores' EBT transactions through a national database that records the details of every EBT transaction at every retail store in the United States that is authorized to accept SNAP benefits."  (Doc. 31, Def.'s Br. in Supp. at ECF p. 12, citing Doc. 31-1, Torres Decl. ¶¶ 8-10).  "FNS uses a computerized fraud detection tool – Anti-Fraud Locator Using EBT Retailer Transactions ('ALERT') - that is capable of identifying EBT transaction patterns indicative of trafficking."  (Doc. 31-1, Torres Decl. ¶ 14).  Specifically, ALERT "can identify EBT transactions that are statistically unusual and fall within particular patterns suggesting that a retailer is not complying with SNAP regulations."  (*Id.* ¶ 15).

It is illegal to traffic in SNAP benefits.  See 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(a) and (e)(1)(i).  In relevant part, "trafficking" is defined as "buying, selling . . . or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food . . . ."  7 C.F.R. § 271.2.  In pertinent part,

"Eligible foods means: (1) Any food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption . . . ." *Id.*

### B. Shreegi's Circumstances

The following background is taken from Defendants' statement of material facts (DSMF)(Doc. 32), Plaintiff's answer (Doc. 35) to DSMF, and Plaintiff's counterstatement of material facts (PCSMF)(Doc. 36). The parties' language will sometimes be borrowed without attribution, but quotation marks will sometimes be used to indicate the party's language is being quoted in a particular instance. As required by the summary judgment standard, the evidence will be presented in the light most favorable to Plaintiff. The Court will also note when the facts are disputed.

Shreegi owns and operates Shenandoah Stop Shop, a convenience store located in Shenandoah, Pennsylvania. (Doc. 32, DSMF ¶ 1, admitted by Plaintiff). Shenandoah Stop Shop became an authorized SNAP retailer on May 21, 2013. (*Id.*, DSMF ¶ 2, admitted by Plaintiff). FNS conducted a compliance review visit of the store on March 26, 2015. (*Id.*, DSMF ¶ 4, admitted by Plaintiff). The store

manager, Jaime Stevens, was present and consented to the review.  (*Id.*, DSMF ¶ 5, admitted by Plaintiff).

At the time of the compliance visit, the store had three cash registers with three scanners and one EBT device.  (Doc. 36, PCSMF ¶¶ 11, 13 and 14, citing Doc. 36-4, ECF pp. 3-7, Hemang Patel Dep.; Doc. 36-5, ECF pp. 3-5, Kirit Patel Dep.; Doc. 36-2, ECF p. 3 Tiffany Becker Dep.).  It also had less than ten shopping carts, and more than ten shopping baskets, with the carts available at the front and back of the store.  (Doc. 36, PCSMF ¶¶ 11 and 12, citing Doc. 36-4, ECF pp. 3-7, Hemang Patel Dep.; Doc. 36-5, ECF pp. 3-5, Kirit Patel Dep.).[1]

The store sold hot foods or foods for on-site consumption and had a deli or prepared food section containing prepared/made-to-order items and other refrigerated foods.  (Doc. 32, DSMF ¶ 8, admitted by Plaintiff).  The store's deli section was in a separate section that sold alcohol.  (*Id.*, DSMF ¶ 9, admitted by Plaintiff).

---

[1]  Defendant asserts that at the time of the visit, the FNS compliance reviewer noted that the store did not have optical scanners, shopping baskets, or shopping carts.  (Doc. 32, DSMF ¶ 6, citing Doc. 28, ECF p. 34, compliance report).  However, on summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  That evidence here includes testimony from multiple depositions that the store had shopping carts and baskets as well as optical scanners.  The Court further notes that the reviewer did agree with Plaintiff that there were "three cash register/checkout station[s] and one EBT device for processing EBT transactions."  (Doc. 32, DSMF ¶ 7, citing Doc. 28, ECF p. 34, compliance report).

The compliance reviewer noted that, at the time of the March 26, 2015 visit, the store did not offer meat or seafood specials or fruit or vegetable boxes for sale. (*Id.*, DSMF ¶ 10, citing Doc. 28, ECF p. 34, compliance report).[2] The reviewer also noted at that time there was a small section of empty shelves, which the manager told the reviewer was being "reset." (*Id.*, DSMF ¶ 11, admitted by Plaintiff). Various dairy, fruit and vegetable, bread and cereal, and meat, poultry, and fish items were available at the store. (*Id.*, DSMF ¶ 12, admitted by Plaintiff). The store's staple food inventory included canned goods, bread, cereal, cheese, milk, and eggs. (*Id.*, DSMF ¶ 15, admitted by Plaintiff). The store also sold frozen bacon, pancakes, pizza, chicken strips, single serve frozen meals, and ice cream. (*Id.*, DSMF ¶ 16, admitted by Plaintiff). The store had a limited supply of fresh produce, no fresh meat or seafood, but it did have deli meats. (*Id.*, DSMF ¶ 17, admitted by Plaintiff).

The reviewer sketched the layout of the public areas of the store and took photos of its interior and exterior. (*Id.*, DSMF ¶ 13, admitted by Plaintiff). The

---

[2] Plaintiff denies this allegation, but cites no evidence to support its denial, so the court will accept Defendants' assertion, as it is supported by the record. Local Rule 56.1 requires, in pertinent part, that '[s]tatements of material facts . . . in opposition to[ ] a motion [for summary judgment] shall include references to the parts of the record that support the statements."

FNS analysis of the information gathered from the compliance review revealed that the store was approximately 3,400 square feet. (*Id.*, DSMF ¶ 14, admitted by Plaintiff).

### 1. Four Suspicious Patterns of Transactions

As part of the compliance review, FNS reviewed Shenandoah Stop Shop's SNAP data for January 2015 through March 2015, and the review revealed four suspicious patterns of transactions. (*Id.*, DSMF ¶ 18, admitted by Plaintiff).

### a. The First Pattern

In the first pattern, 36 sets of transactions, two transactions to a set, totaling $5,547.92, were rapid and repetitive transactions made in a short period of time by various households. (Doc. 32, DSMF ¶ 19, citing Doc. 28, ECF pp. 77-84, admitted by Plaintiff).[3] In most of these sets of transactions, the second transaction took place less than two minutes after the previous transaction. (Doc. 32, DSMF ¶ 20,

---

[3] Paragraph 19 asserts the transactions were rapid and repetitive. Plaintiff denies that the transactions were repetitive but otherwise admits this allegation. The Court agrees with Plaintiff, as the record cited by Defendants does not mention that the transactions were repetitive. However, the Court will retain Defendant's phrasing as the factual dispute is not material.

citing Doc. 28-3, ECF p. 49).[4]  FNS found this suspicious given the numerous steps

involved for a cashier in making and processing a legitimate purchase, including the

cashier's manually handling the item to determine the price in the absence of an

optical scanner, the manual keying of amounts into the register, and bagging the

items.  (Doc. 32, DSMF ¶¶ 20 and 21, citing Doc. 28-3, ECF p. 49, Ahmed case

analysis).[5]

Defendant highlights two examples.  In one instance, a $185.50 transaction

for one household was followed less than two minutes later by a $116.80 transaction

for another household.  (Doc. 32, DSMF ¶ 22, citing Doc. 28, ECF p. 81,

transactions 17 and 18; admitted by Plaintiff).  In another instance, one transaction

of $44.79 is followed 30 seconds later by a second transaction of $287.10 for

another household.  (Doc. 32, DSMF ¶ 23, citing Doc. 28, ECF p. 82, transactions

37 and 38; admitted by Plaintiff).

---

[4]  Plaintiff contests this allegation because the record cited says the interval was six
minutes.  (Doc. 35, Pl.'s answer to DSMF ¶ 20).  The record does so state.  However, review of
the complete record of the 36 sets of transactions shows that 27 of the 36 were less than two
minutes apart.  Thus Defendant's statement, that most of the sets were two minutes apart, is
true.

[5]  The Court accepts Plaintiff's representation that Arif Ahmed, FNS program
specialist, prepared the case analysis, although Gilda Torres's name also appears on the case
analysis and, as Plaintiff represents, accepted it.  (Doc. 37, Pl.'s Opp'n Br. at ECF p. 12).

Plaintiff does not dispute these transactions took place but provides an explanation why they were not trafficking ones as follows. According to Plaintiff, it was a "common practice" for its customers to place orders in advance, and some customers would ask Shreegi to purchase items for them from another store and make it part of their order with Shreegi. (Doc. 36, PCSMF ¶ 3, citing Doc. 49-1, ECF pp. 40-41, 45-46), Falguni Patel Dep.). After Shreegi purchased the merchandise from the other store, an employee would ring up all the items, scan them into the computer, put them in a bag, and write the total on the receipt. (PCSMF ¶ 4, citing Doc. 49-1, ECF p. 46, Falguni Patel Dep.). When the customer came in to pick the order up, the employee only had to recall the invoice from any of the three cash registers and then process the transaction immediately through the EBT system. (PCSMF ¶ 5, citing Doc. 49-1, ECF pp. 47-49, Falguni Patel Dep.). Thus, Plaintiff argues, two SNAP purchases could be processed within a few minutes of each other because the orders were already in the system.

### b. The Second Pattern

In the second suspicious transaction pattern found during the EBT analysis, there were rapid and repetitive transactions in a short period of time from the same

household account. This pattern contained 26 sets of rapid transactions in which a household's EBT card was used repetitively within a 24-hour period, totaling $5,304.73. (Doc. 32, DSMF 24, citing Doc. 28, ECF pp. 85-87; admitted by Plaintiff). In one set of transactions, a household account conducted a transaction for $151.09, which was followed 57 seconds later by a transaction for $149.98 for the same account. (Doc. 32, DSMF ¶ 25, citing Doc. 28, ECF p. 85, transactions 73 and 74; admitted by Plaintiff). In another set, a transaction for $149.50 was followed 20 minutes later by a transaction for $101.50 from the same account. (Doc. 32, DSMF ¶ 26, citing Doc. 28, ECF p. 85, transactions 87 and 88; admitted by Plaintiff). In another instance, a household recorded a transaction of $266.20, then a second transaction of $27.34, a third transaction of $252.49, and a fourth transaction of $141.45, all in less than 24 hours. (Doc. 32, DSMF ¶ 27, citing Doc. 28, ECF p. 87, transactions 119 through 122; admitted by Plaintiff). FNS has found that multiple transactions such as these are methods stores use to avoid high-dollar transactions and are suggestive of trafficking.[6] (Doc. 32, DSMF ¶ 28, citing Doc. 28-3, ECF p. 50, Ahmed case analysis).

---

[6] Plaintiff denies this statement but does so by merely asserting it "did not engage in trafficking." (Doc. 35, Pl.'s answer to DSMF ¶ 28).

Plaintiff does not dispute these transactions took place but provides evidence that it says explains that the transactions were not trafficking ones.  First, Plaintiff says "it was not uncommon" for one household to make more than one transaction in a 24-hour period since Shenandoah is a poor town and most of Shreegi's customers anxiously awaited their funds to arrive on their cards.  (Doc. 35, Pl.'s answer to DSMF ¶ 24).[7]

Second, Plaintiff says the transactions are not unusual because "many customers" would typically use the funds within the first day or two when funds became available to get everything they needed for the whole month.  (Doc. 35, Pl.'s answer to DSMF ¶ 25).[8]

Third, the transactions were not unusual because "it was not uncommon" for a customer to place an order with the store, then arrive at the store to pick up the

---

[7]  Plaintiff cites no evidence to support this statement, but it appears to rely on its lawyer's letter of May 13, 2015, to FNS explaining the transactions.  (Doc. 28, ECF p. 99).  In that letter, the lawyer says: "Shenandoah is a very poor community and many people wait until they receive funds on their EBT Card in order to make all or most of their food purchases."

[8]   In support of this statement, Plaintiff cites the deposition of Falguni Patel, Shreegi's owner, where Patel testifies that it was not unusual to see three transactions following an initial one for the amounts mentioned since some people ("a handful of people basically") "had lots of funds."  They would use their SNAP funds in the first week or day or two, buy everything that they want, and that would be it.  They would have $100 or less left "for other stuff."  (Doc. 49-1, ECF p. 41, Falguni Patel Dep.).

ordered items, and then purchase additional items under a separate transaction. (Doc. 35, Pl.'s answer to DSMF ¶ 26).[9]

Fourth, it was not unusual, as in the last example Defendant cites, to see three transactions following an initial one for the amounts mentioned, to see "multiple transactions," as Plaintiff puts it. Customers placed their orders ahead of time to make sure they received what they needed due to the fact that the store is generally busier in the beginning of the month. (Doc. 35, Pl.'s answer to DSMF ¶ 27).[10]

### c. The Third Pattern

The third suspicious transaction pattern was the depletion of the majority or all of a household's benefits in a short time frame. (Doc. 32, DSMF ¶ 29, admitted by Plaintiff). There were 25 sets of suspicious transactions involving 16 households

---

[9] For this statement, Plaintiff relies on the deposition of Tiffany Becker, an employee. Becker testified that after the employee would get the order number from the screen, "at times" customers purchased items under a separate transaction during the same visit to the store. But she did not know how often that would happen. (Doc. 36-2, ECF p. 4, Becker Dep.).

[10] For this statement, Plaintiff relies on the Falguni Patel deposition where Patel testified that some people, "a handful of people basically," "had lots of funds." They would use their SNAP funds in the first week or day or two, buy everything that they want, and that would be it. They would have $100 or less left "for other stuff." (Doc. 49-1, ECF p. 41, Falguni Patel Dep.). Thus, at the beginning of the month, three purchases within 24 hours of an initial transaction by the same household in the amounts mentioned was not unusual for the store; at the end of the month, it would be different. (Doc. 49-1, ECF pp. 39-41, Falguni Patel Dep.).

totaling $4,493.69. (Doc. 32, DSMF ¶ 30, admitted by Plaintiff). One account depleted its balance from $355.31 to $35.03 through a series of five transactions that occurred on the same day. (Doc. 32, DSMF ¶ 31, citing Doc. 28, ECF p. 88, transactions 125 through 129; admitted by Plaintiff). FNS identified at least five other examples of a household depleting its balance in one or two transactions at Shenandoah Stop Shop. (Doc. 32, DSMF ¶ 32, citing Doc. 28, ECF pp. 88-90; admitted by Plaintiff).

FNS has found that depleting a household's entire allotment in one or a few transactions or within one or two days, leaving little or no benefits for the rest of the month, is inconsistent with normal shopping patterns of SNAP households and is often indicative of trafficking. (Doc. 32, DSMF ¶ 33, citing Doc. 28-3, ECF pp. 50-51).[11]

Plaintiff does not dispute these transactions took place but provides evidence that it says explains that the transactions were not trafficking ones. First, Plaintiff says it was not unusual for a household to use most or all of its benefits in a short

_____

[11]    Plaintiff denies this statement because it is based on "erroneous assumptions." (Doc. 35, Pl.'s answer to DSMF ¶ 33). However, Plaintiff does not specify what those "erroneous assumptions" are nor does it cite any evidence in support.

period of time.  (Doc. 35, Pl.'s answer to DSMF ¶ 29).[12]  Second, it was not unusual

for one household to make separate transactions on the same day.  (Doc. 35 Pl.'s

answer to DSMF ¶ 31).[13]

### d.  The Fourth Pattern

The fourth suspicious pattern found in the data was a series of EBT

transactions that were excessively large compared to the average convenience store

transaction in Pennsylvania.[14]  (Doc. 32, DSMF ¶ 34, citing Doc. 28, ECF pp. 91-94,

citing the attachment to the charge letter.)  This fourth pattern contained 195

transactions totaling $21,076.87.  (Doc. 32, DSMF ¶ 35, citing Doc. 28, ECF pp. 91-

---

[12]    In support, Plaintiff relies on the Falguni Patel deposition where Patel testified that
the same customers would, at the beginning of the month, make SNAP transactions within a
couple of minutes of each other.  They would do so because at the beginning of the month, they
knew what foods they wanted to buy and (as noted above) would tell Shenandoah what they
wanted before they came in.  Once at the store, they would want to buy something else so that
there would be a second transaction shortly after the first.  (Doc. 49-1, ECF pp. 37-41, Falguni
Patel Dep.).  Plaintiff also refers to the Patel testimony described in note 10, above, concerning
multiple transactions.

[13]    In support, Plaintiff relies on the Falguni Patel deposition where Patel testified that
it happened a lot of times that customers would engage in a second transaction because they
would purchase something else after arriving at the store to pick up their order.  (Doc. 49-1,
ECF p. 38, Falguni Patel Dep.).

[14]    Plaintiff denies this statement, contending that Shenandoah Stop Shop is not a
convenience store but is instead a grocery store.  For reasons discussed below, the court
concludes it is a convenience store.

94, citing the attachment to the charge letter; admitted by Plaintiff). The average transaction at a convenience store in Pennsylvania during the review period was about $9.00, while 195 out of 2,625 transactions at the Shenandoah Stop Shop during the review period were for more than $35, which is 300% above the state average. (Doc. 32, DSMF ¶ 36, citing Doc. 28-3, ECF p. 51, Ahmed case analysis; admitted by Plaintiff). The average transaction at the store during the review period was $15.02, which is 69% above the state average. (Doc. 32, DSMF ¶ 37, citing Doc. 28-3, ECF p. 51, Ahmed case analysis; admitted by Plaintiff).

Plaintiff argues that these transactions are normal when other facts are considered. It contends that "Shenandoah is a very poor town compared to other towns in the state where the needs may not be as high." (Doc. 35, Pl.'s answer to DSMF ¶ 36).[15] Since "Shenandoah is a very poor town, and most of Shreegi's customers did not drive," they made "Shreegi a place where customers would tend to spend most of their benefits," thus "increas[ing] the average for the store." (Doc. 35, Pl.'s answer to DSMF ¶ 37).[16]

---

[15] Plaintiff cites no evidence to support this statement.

[16] Plaintiff does not cite any portion of the record to support this statement. It appears that the evidence can be found by way of Doc. 36, PCSMF ¶ 1, since that paragraph contains essentially identical language. PCSMF ¶ 1 cites the Falguni Patel deposition, (Doc. 49-1, ECF pp. 43-45), where Patel testifies that about 50% of Shreegi's customers did not drive and

The 2015 store compliance visit did not reveal any expensive food or other specialty items that FNS believed would justify the large average amount of each EBT transaction. (Doc. 32, DSMF ¶ 38, citing Doc. 28-3, ECF p. 51, Ahmed case analysis: "the store layout and inventory do not support such a high percentage of transactions markedly exceeding the average transaction amount of similar stores.").

Plaintiff disputes this statement, contending that the photos from the compliance report revealed expensive food items. Plaintiff also maintains that since the store visit took place on March 26, 2015, it was close to the end of the month when the store was in the process of restocking the shelves for the beginning of the next month, (Doc. 35, Pl.'s answer to DSMF ¶ 38), thus explaining the lack of inventory on the shelves.[17] The beginning of the month is the busiest time for Shreegi. (Doc. 49-1, ECF p. 22, Falguni Patel Dep.).

FNS also analyzed the location of other SNAP-authorized stores nearby and found that within a one-mile radius, there were two small grocery stores, one

_____

placed orders ahead of time, and after they came to the store to pick up their purchases, someone from Shreegi would drive them home.

[17] Plaintiff cites no evidence to support this assertion. However, Plaintiff elsewhere relies on the compliance reviewer's report on the store visit of March 26, 2015, which was near the end of the month, stating that the manager told the inspector that the shelves were in the process of being "reset." (Doc. 35, Pl.'s answer to DSMF ¶ 66, citing Doc. 28, ECF p. 35, compliance report).

supermarket, two combination stores, and four other convenience stores that were authorized to accept SNAP benefits.  (Doc. 32, DSMF ¶ 39, citing Doc. 28-3, ECF p. 52, Ahmed case analysis; admitted by Plaintiff).

A comparison of Shenandoah Stop Shop EBT data against state-wide averages for convenience stores found that during the review period, patterns at Shenandoah Stop Shop were not typical and exhibit "an excessive number of high dollar transactions" given that the store does not sell any unique items that cannot be purchased at the other stores in the area.  (Doc. 32, DSMF ¶ 40, citing Doc. 28-3, ECF pp. 52-54, Ahmed case analysis; admitted by Plaintiff).[18]

FNS also examined the shopping patterns of four households during the review period that were involved in some of the suspicious transactions.  In each case, the households had access to and did in fact shop at larger, better stocked supermarkets and grocery stores, yet the households still spent substantial sums of SNAP benefits at Shenandoah Stop Shop, which FNS believed indicated possible trafficking.  (Doc. 32, DSMF ¶ 41, citing Doc. 28-3, ECF pp. 54-56, Ahmed case analysis; admitted by Plaintiff).

---

[18]    Plaintiff admits this statement except that it says it should not have been compared to a convenience store.

Plaintiff does not dispute this statement but would qualify it with the following evidence. The first household in question only shopped at Boyers Food Markets Inc., one of the stores mentioned, once per each month monitored. The second household shopped at Boyers once in February and twice in March 2015. The remainder of that household's shopping was at the Shenandoah One Stop. (Doc. 35, Pl.'s answer to DSMF ¶ 41, citing Doc. 28-3, ECF p. 54-56, Ahmed case analysis).

Having considered all of the information set forth above, FNS found a "clear and repetitive pattern of unusual, irregular and inexplicable SNAP activity," which would warrant issuance of a trafficking charge letter. (Doc. 32, DSMF ¶ 42, citing Doc. 28-3, ECF p. 56, Ahmed case analysis).[19]

## 2. The Charge Letter and Plaintiff's Response

FNS sent Shreegi the Charge Letter dated May 4, 2015. (Doc. 32, DSMF ¶ 43, citing Doc. 28, ECF pp. 77-79, the Charge Letter; admitted by Plaintiff). The letter charged Shreegi with trafficking based on FNS's analysis of the EBT

---

[19] Plaintiff denies this statement but only on the basis that FNS relied on erroneous information when issuing the charge letter. However, Plaintiff does not provide a record to support this denial, and, in any event, the Court notes Defendant's paragraph 42 merely asserts that FNS found a pattern of suspicious activity; the paragraph does not assert substantively that the pattern was true.

transactions for January 2015 through March 2015, which established the four suspicious patterns of EBT activity. (Doc. 32, DSMF ¶¶ 44 and 45, citing Doc. 28, ECF p. 77; admitted by Plaintiff). The letter grouped the suspicious transactions into the patterns described above, (Doc. 32, DSMF ¶ 46, citing Doc. 28, ECF p. 77; admitted by Plaintiff), with the suspicious transaction details attached to the letter, broken down by pattern into four attachments. (Doc. 32, DSMF ¶ 47, citing Doc. 28, ECF pp. 80-94, the attachments; admitted by Plaintiff).

The letter informed Shreegi it was being considered for permanent disqualification from the SNAP, (Doc. 32, DSMF ¶ 45, citing Doc. 28, ECF p. 77; admitted by Plaintiff), and gave it the opportunity to reply to the charges by contacting Arif Ahmed. (Doc. 32, DSMF ¶ 48, citing Doc. 28, ECF pp. 78-79; admitted by Plaintiff). The letter also stated the store could request a CMP in lieu of permanent disqualification. (Doc. 32, DSMF ¶ 49, citing Doc. 28, ECF pp. 77-78; admitted by Plaintiff).

In response to the letter, Shreegi provided FNS with copies of store receipts from SNAP transactions from March 11-31, 2015. (Doc. 32, DSMF ¶ 52, citing Doc. 28-1, ECF pp. 39-64; admitted by Plaintiff). Shreegi stated that the receipts demonstrated that the items purchased met the requirements of the SNAP. Shreegi

also provided the following items: a spreadsheet summarizing all food purchases made by the store and copies of inventory purchase receipts. (Doc. 32, DSMF ¶ 53, admitted by Plaintiff; Doc. 28, ECF p. 99; Doc. 28-1, ECF pp. 3-9 (spreadsheet); Doc. 28-1, ECF pp. 10-38 (inventory receipts); and Doc. 28-1, ECF p. 66 to 28-3, ECF p. 43 (inventory receipts).

By way of a letter dated may 13, 2015, Shreegi's lawyer provided the following response in denying SNAP trafficking. First, the surrounding area is very poor and many people wait until they receive their SNAP benefits to do all or most of their shopping. (Doc. 32, DSMF ¶ 54, citing Doc. 28, ECF p. 99, Plaintiff's lawyer's letter of May 13, 2015; admitted by Plaintiff). Second, many of its customers did not have vehicles and relied upon the store to purchase items from other retailers for the customers. (Doc. 32, DSMF ¶ 55, citing Doc. 28, ECF p. 99, Plaintiff's lawyer's letter of May 13, 2015; admitted by Plaintiff).

Further, the letter requested that if the information provided did not address FNS's concerns, the agency impose a CMP in lieu of SNAP disqualification. (Doc. 32, DSMF ¶ 56, citing Doc. 28, ECF p. 99; admitted by Plaintiff). In support of the alternative sanction, Plaintiff alleged that it maintains a comprehensive training policy to prevent SNAP violations. (Doc. 32, DSMF ¶ 57, citing Doc. 28, ECF p.

99; admitted by Plaintiff).  Plaintiff provided a copy of its training policy.[20]  (Doc. 32, DSMF ¶ 58, citing Doc. 28, ECF p. 100 to Doc. 28-1, ECF p. 2, the training manual; admitted by Plaintiff).  Shreegi stated that it was not aware of, nor did it approve, any conduct which was alleged in the Charge Letter.  (Doc. 32, DSMF ¶ 59, citing Doc. 28, ECF p. 99; admitted by Plaintiff).

### 3.  FNS's Response

After reviewing the material provided by Plaintiff, FNS concluded that the information did not sufficiently explain the suspicious transactions.  (Doc. 32, DSMF 60, citing Doc. 28-3, ECF pp. 58-70, FNS sanction recommendation report).[21]

### a.  The First Pattern

With respect to the first pattern - sets of rapid and repetitive transactions made in a short period of time by various households - FNS determined that it would be difficult to complete legitimate transactions in the short periods of time, given the

---

[20]    The training policy is what the parties refer to as Plaintiff's four-page training manual, with a little over one page of the manual dealing with SNAP requirements.

[21]    Plaintiff denies this allegation, asserting that it has explained the amount and frequency of the transactions.  But the allegation is true to the extent that it asserts that FNS concluded that Plaintiff had not sufficiently explained the suspicious transactions.

dollar amounts of the transactions involved and all of the steps needed to complete the transactions. (Doc. 32, DSMF ¶ 61, citing Doc. 28-3, ECF p. 60, FNS sanction recommendation report). The sanction recommendation report provides more detail on these steps, including the cashier's manually handling the item to determine the price in the absence of an optical scanner, the manual keying of amounts into the register, and bagging the items. (Doc. 28-3, ECF p. 60, FNS sanction recommendation report).

Plaintiff disputes this statement with evidence that there were three cash registers and one EBT device. This meant that "[m]ultiple cashiers could check out different customers at the same time and then wait in line to use the EBT machine which could recall orders instantaneously making it possible for orders to be processed within a matter of seconds." (Doc. 35, Pl.'s answer to DSMF ¶ 61).[22]

FNS found that these pattern-one transactions were made too rapidly to be credible and were strong indicators of trafficking and Shreegi did not provide any

---

[22] The record does support the fact that there were three cash registers and one EBT device. (Doc. 36, PCSMF ¶¶ 11, 13 and 14; Hemang Patel Dep., Doc. 36-4, ECF pp. 3-7; Kirit Patel Dep., Doc. 36-5, ECF pp. 3-5; Tiffany Becker Dep., Doc. 36-2, ECF p. 3). And Plaintiff previously established that because customers would place their orders ahead of time, EBT transactions could follow closely on one another. ( Doc. 36 PCSMF ¶¶ 4 and 5, citing Doc. 49-1, ECF pp. 40-46, and 49-48, Falguni Patel Dep.). But Plaintiff does not cite to that portion of the record showing that employees would check out different customers at the same time and then actually wait in line to use the EBT device.

valid explanation for the transactions in this pattern.  (Doc. 32, DSMF ¶ 62, citing

Doc. 28-3, ECF p. 60, FNS sanction recommendation report).

Plaintiff disputes this statement, providing evidence that orders could be

recalled from all three cash registers, with the EBT card then being swiped through

the EBT device, a process that would take only about five seconds.  (Doc. 35, Pl.'s

answer to DSMF ¶ 62, citing Doc. 49-1, ECF pp. 48-50, Falguni Patel Dep.).

### b.  The Second Pattern

With respect to the second pattern, FNS found that multiple transactions from

a household's EBT account in short time frames are typical methods used by stores

that engage in trafficking to avoid single high-dollar transactions, (Doc. 32, DSMF ¶

63, citing Doc. 28-3, ECF p. 61, FNS sanction recommendation report), and that

Plaintiff did not provide a valid explanation for these transactions.  (Doc. 32, DSMF

¶ 64, citing Doc. 28-3, ECF p. 61, FNS sanction recommendation report).  In

response to these statements, Plaintiff admits that multiple transactions from the

same household in a short time frame may indicate trafficking, but disputes that it

happened here.  As noted above, Plaintiff provides evidence that the multiple

transactions resulted from customers placing orders before coming to the store and

then buying other items when they arrived to pick up the order. (Doc. 35, Pl.'s answer to DSMF ¶¶ 63 and 64; Doc. 49-1, ECF pp. 40-46, and 49-48, Falguni Patel Dep.).

### c. The Third Pattern

With respect to the third pattern, FNS concluded that a household depleting its entire monthly SNAP allotment in one or a few transactions is inconsistent with normal shopping behavior of SNAP benefit households, and Plaintiff did not provide a reasonable explanation for this pattern. (Doc. 32, DSMF ¶ 65, citing Doc. 28-3, ECF pp. 61-62, FNS sanction recommendation report).

In response to this allegation, Plaintiff denies that this pattern is inconsistent with normal shopping behavior, explaining that "Shenandoah is a very poor community and many people wait until they receive funds on their EBT Card in order to make all or most of their food purchases." (Doc. 35, Pl.'s answer to DSMF ¶ 65, citing and quoting Doc. 28, ECF p. 99, Plaintiff's lawyer's letter of May 13, 2015).

### d. The Fourth Pattern

With respect to the fourth pattern, FNS found that the pictures and visible inventory from the March 2015 store visit did not support the high percentage of the store's transactions that exceeded the average convenience store transactions in Pennsylvania. (Doc. 32, DSMF ¶ 66, citing Doc. 28-3, ECF p. 62).

Plaintiff disputes this statement because the store visit happened on March 26, 2015, near the end of the month, and the manager told the inspector that the shelves were in the process of being restocked. (Doc. 35, Pl.'s answer to DSMF ¶ 66, citing Doc. 28, ECF p. 35, compliance report). Restocking near the end of the month "is [also] consistent with the testimony that most transactions with SNAP occur within the first two weeks of the month." (Doc. 35, Pl.'s answer to DSMF ¶ 66, citing Doc. 49-1, ECF p. 22, Falguni Patel Dep.).

FNS also found that the SNAP data disclosed that four households that made large dollar transactions at Shenandoah Stop Shop also shopped at larger and better stocked stores that were, in some cases, closer to the customers' homes than Shenandoah Stop Shop. (Doc. 32, DSMF ¶ 67, citing Doc. 28-3, ECF p. 63 and Doc. 28-3, ECF p. 68, FNS sanction recommendation report).

Plaintiff admits that these four households did shop at other stores, but has cited to evidence that shows most of the shopping occurred at Shreegi. Household

-30-

One shopped at Shreegi eleven times and other stores three times between January and March 2015. Household Two shopped at Shreegi nineteen times and other stores three times during the three-month period. Household Three shopped at Shreegi thirteen times and other stores seven times during the three-month period. Household Four shopped at Shreegi five times and other stores four times during the three-month period. (Doc. 35, Pl.'s answer to DSMF ¶ 67, citing Doc. 28-3, ECF pp. 55-56, Ahmed case analysis).

### e. Review of Plaintiff's Submissions

As part of its review, FNS scrutinized the receipts and invoices that Shreegi submitted and concluded that 74 invoices were from outside of the review period. (Doc. 32, DSMF ¶ 68, citing Doc. 28-3, ECF p. 60; admitted by Plaintiff).

Of the 75 EBT receipts produced for the review period, most included a "non-tax" item, but provided no further description; thus it was impossible to determine if these represented valid transactions. (Doc. 32, DSMF ¶ 69, citing Doc. 28-3, ECF pp. 67-68; admitted by Plaintiff).[23] In many cases, the "non-tax" was the most

---

[23]    Plaintiff asserts "[b]y way of further answer, the majority of the customers would purchase groceries at Shreegi. Groceries are non-taxable items. The majority of the taxable items were purchased at the Shenandoah One Stop which is adjacent to Shreegi." (Doc. 35, Pl.'s answer to DSMF ¶ 69). However, Plaintiff cites no evidence to support this allegation.

expensive item on the receipt. (Doc. 32, DSMF ¶ 70, citing Doc. 28-3, ECF pp. 67-68; admitted by Plaintiff).

### 4. The Determination Letter

On July 13, 2015, FNS issued a Determination Letter, which informed Shreegi that after reviewing all of the information provided, the agency had found that the violations cited in the Charge Letter had occurred at the Shenandoah Stop Shop. (Doc. 32, DSMF ¶ 71; Doc. 28-3, ECF p. 71; admitted by Plaintiff). FNS advised Shreegi that it was ineligible for a CMP because it had failed to provide sufficient evidence to demonstrate that it had implemented an effective training program to prevent SNAP violations. (Doc. 32, DSMF ¶ 72; Doc. 28-3, ECF p. 71; admitted by Plaintiff). Shreegi was advised of its right to appeal to the agency's Administrative Review Branch. (Doc. 32, DSMF ¶ 73, citing Doc. 28-3, ECF p. 71; admitted by Plaintiff). Plaintiff's counsel pursued the appeal.

### 5. The Final Agency Decision

On October 23, 2015, the Agency issued its Final Agency Decision, signed by Administrative Review Officer (ARO) Mary Kate Karagiorgos, which concluded that the permanent disqualification was appropriate. (Doc. 32, DSMF ¶ 77, citing

Doc. 28-6, ECF p. 91 to Doc. 28-7, ECF p. 4, the Final Agency Decision; admitted

by Plaintiff). ARO Karagiorgos summarized the evidence submitted by Shreegi, as

well as the information obtained during the store visit and through the EBT data,

and concluded that the agency had presented a prima facie case that Shreegi had

trafficked in SNAP benefits. (Doc. 32, DSMF ¶ 79, citing Doc. 28-6, ECF pp. 95-

96).[24] ARO Karagiorgos concluded that "[e]ach attachment furnished with the

charge letter represents the questionable and unusual patterns of SNAP transactions

indicative of trafficking which were conducted at [the store] during the review

period. As there is more than one pattern of irregular transactions, the case of

trafficking becomes more convincing." (Doc. 32, DSMF ¶ 80, citing Doc. 28-6,

ECF p. 96).[25]

### a. The First Pattern

Regarding the first set of suspicious transactions – i.e., rapid and repetitive

high-dollar transactions that occurred within a short period of time – ARO

Karagiorgos analyzed the transactions listed and concluded that given the store's

---

[24] Plaintiff admits this statement but asserts it is based on "inaccurate information." (Doc. 35, Pl's answer to DSMF ¶ 79).

[25] Plaintiff admits this statement but asserts it is based on "inaccurate information." (Doc. 35, Pl's answer to DSMF ¶ 80).

layout and equipment on hand, the pattern-one transactions were indicative of trafficking.  (Doc. 32, DSMF ¶ 81, citing Doc. 28-6, ECF p. 96).[26]  ARO Karagiorgos also concluded that Shreegi did not offer any compelling justification or evidence that all of the irregular transactions in Pattern One contained only eligible food items.  (Doc. 32, DSMF ¶ 82, citing Doc. 28-6, ECF p. 96, admitted by Plaintiff).[27]  ARO Karagiorgos decided that the irregular transaction patterns cited in the first attachment to the Charge Letter were more likely than not the result of trafficking.  (Doc. 32, DSMF ¶ 83, citing Doc. 28-6, ECF p. 96; admitted by Plaintiff).[28]

### b.  The Second Pattern

Regarding the second set of suspicious transactions –  the multiple EBT transactions by the same household in unusually short time frames – ARO Karagiorgos noted that while it is not unusual for SNAP participants to have more

---

[26]  Plaintiff only admits that this is ARO Karagiorgos's conclusions.  (Doc. 35, Pl.'s answer to DSMF ¶ 81).

[27]  Plaintiff only admits that this is ARO Karagiorgos's conclusions.  It denies that it did not offer an explanation for  the violations in the first pattern.  (Doc. 35, Pl.'s answer to DSMF ¶ 82).

[28]  Plaintiff admits this was ARO Karagiorgos' finding but denies that any trafficking was being committed.  (Doc. 35, Pl.'s answer to DSMF ¶ 83).

than one transaction per day, it is not common for those multiple transactions to be in such large amounts as they were at Shenandoah Stop Shop. (Doc. 32, DSMF ¶ 84, citing Doc. 28-6, ECF p. 97).

Plaintiff denies that it was uncommon for multiple transactions to be as high as they were at Shreegi when it is considered that "the town is poverty ridden and many people would anxiously wait for their EBT funds to arrive." (Doc. 35, Pl.'s answer to DSMF ¶ 84, citing Doc. 28, ECF p. 99, Plaintiff's lawyer's letter of May 13, 2015). Plaintiff also counters by asserting that "many people do not have vehicles to drive to other stores, therefore they make multiple large purchases multiple times at Shreegi," again citing the lawyer's letter. (*Id.*).

ARO Karagiorgos noted that the store visit by the compliance reviewer did not offer any compelling reason why SNAP customers would make multiple purchases at the store within the same day because the store did not have a "great variety of products, price advantage . . . significant bulk items for sale." (Doc. 32, DSMF ¶ 85, citing Doc. 28-6, ECF p. 97). Plaintiff disputes this statement "because

the store visit was on March 26, 2015, when the inventory was low."  (Doc. 35, Pl.'s answer to DSMF ¶ 85).[29]

ARO Karagioros noted that the same SNAP participants that made the pattern-two transactions were also shopping at stores that were larger and had a better inventory than Shenandoah Stop Shop.  (Doc. 32, DSMF ¶ 86, citing Doc. 28-6, ECF p. 97; admitted by Plaintiff).[30]

ARO Karagioros concluded that Shreegi did not provide any explanation for the pattern-two transactions, and therefore, "it was more likely true than not true that these patterns are the result of [Shreegi] trafficking in SNAP benefits."  (Doc. 32, DSMF ¶ 87, citing Doc. 28-6, ECF p. 98).[31]

### c.  The Third Pattern

As to the third set of suspicious transactions, in which individual SNAP households exhausted all or most of their benefits in short time frames at the

---

[29]  Plaintiff cites no evidence in support of this statement but has previously relied on the compliance report for this visit stating that the store manager indicated the shelves were being "reset" on that date.  (Doc. 28, ECF p. 35, compliance report).

[30]  Plaintiff admits that some customers would shop at other stores but asserts that they did the majority of their shopping at Shreegi.  However, it cites no evidence in support of this statement.

[31]  Plaintiff denies it did not provide an explanation for the transactions.  (Doc. 35, Pl.'s answer to DSMF ¶ 87).  However, it cites no evidence to support it.

beginning of the month, ARO Karagiorgos determined that this is not a typical shopping pattern. (Doc. 32, DSMF ¶ 88, citing Doc. 28-6, ECF p. 98). ARO Karagiorgos observed that while many SNAP participants do shop early in the month, "most households do not spend all or a majority of their monthly benefits in only a few transactions or on a single day." (Doc. 32, DSMF ¶ 89, citing Doc. 28-6, ECF p. 99; admitted by Plaintiff).

Plaintiff denies paragraph 88 in part. It admits that "individual SNAP households would [not] exhaust most of their benefits in the beginning of the month . . ." (Doc. 35, Pl.'s answer to DSMF ¶ 88). However, it denies that this pattern is not typical of a town like Shenandoah, "a very poor town [where] many benefit holders would exhaust their benefits from the previous month early, and thus anticipatorily wait for their benefits to arrive and exhaust them fairly quickly in order to feed their families." (*Id.*, citing Doc. 28, ECF p. 99, the lawyer's letter).[32]

ARO Karagiorgos further noted that the store "is not set up to provide all of one's food needs and lacks an abundant depth and breadth of staple foods." (Doc.

---

[32]    The lawyer's letter reads as follows: "Unfortunately, Shenandoah is a very poor community and many people wait until they receive funds on their EBT card in order to make all or most of their food purchases." (Doc. 28, ECF p. 99).

32, DSMF ¶ 90, citing Doc. 28-6, ECF p. 99).[33]  She also stated: "That SNAP households would spend large amounts of their limited benefit allotments at [the store], a store that has no shopping carts or hand baskets, very little counter space at checkout, and sells limited staple foods that promote a healthy diet as opposed to a profusion of accessory food typical of convenience store offerings strains credulity." (Doc. 31, Def.'s Br. in Supp. at ECF p. 31, citing Doc. 28-6, ECF p. 99).

### d.  The Fourth Pattern

ARO Karagiorgos examined the fourth set of transactions, which involved excessively large transactions on average made from recipient accounts.  (Doc. 32, DSMF ¶ 91, citing Doc. 28-6, ECF p. 99; admitted by Plaintiff).  This Pattern Four list included 195 transactions from 16 different households, ranging from $35.08 to $287.10, amounts which are at least 300% higher than the average purchase amount for conveniences stores in Pennsylvania.  (Doc. 32, DSMF ¶ 92, citing Doc. 28-6,

---

[33]    Plaintiff denies this statement, asserting it is "based on the erroneous inspection report dated March 26, 2015."  (Doc. 35, Pl.'s answer to DSMF ¶ 90).  However, Plaintiff does not cite to the record.  It might be a reference to the compliance report in which the reviewer noted at that time there was a small section of empty shelves, which the manager said was being "reset."  (Doc. 28, ECF p. 35, compliance report).

ECF p. 99; admitted by Plaintiff).[34]  Pattern Four transactions totaled $21,096.87, which was 53% of the store's total SNAP redemptions during the review period. (Doc. 32, DSMF ¶ 93, citing Doc. 28-6, ECF p. 99; admitted by Plaintiff).

ARO Karagiorgos determined that these transactions were inconsistent "with the store's limited inventory" and "mostly . . . low dollar value food," as the store does not offer "bulk" items or "any ethnic or specialty foods that sell for" a high dollar amount.  (Doc. 32, DSMF ¶ 94, citing Doc. 28-6, ECF p. 99).[35]

### e.  Review of Plaintiff's Submissions

ARO Karagiorgos reviewed the information that Shreegi provided in response to the Charge Letter and determined that 75 EBT receipts dated March 11 through March 31, 2015, did not provide a complete picture as to what was purchased because many receipts had large priced items labeled "non-tax," but those receipts

---

[34]  While admitting this paragraph is true, Plaintiff asserts that it "provided an explanation for the high purchase amount."  (Doc. 35, Pl.'s answer to DSMF ¶ 92).  However, Plaintiff does not support this statement by citing to the record.

[35]  Plaintiff disputes this statement, asserting that '[t]he store's inventory was limited on March 26, 2015, because the shelves were in the process of being restocked."  (Doc. 35, Pl.'s answer to DSMF ¶ 94, citing Doc. 28, ECF p. 35, the compliance report).

did not support the store's claim that the transactions were legitimate. (Doc. 32, DSMF ¶ 95, citing Doc. 28-6, ECF p. 100).[36]

ARO Karagiorgos reviewed the inventory invoices submitted by Shreegi to determine if they would support the $39,420.65 in total SNAP redemptions during the review period (the state-wide convenience store average for SNAP redemptions during the same period was $10,001.99). (Doc. 32, DSMF ¶ 96, citing Doc. 28-6, ECF p. 100; admitted by Plaintiff).[37] ARO Karagiorgos concluded that the $31,417.56 in eligible food purchases from the invoices did not support the total SNAP redemptions ($39,420.65). (Doc. 32, DSMF ¶ 97, citing Doc. 28-6, ECF p. 100).[38]

### f. Other Issues

---

[36] Plaintiff disputes this statement but does so only by noting that "[g]roceries are a non-taxable item." (Doc. 32, Pl.'s answer to DSMF ¶ 95). ARO Karagiorgos goes on to say that the receipts did not support Plaintiff's claim that the transactions were legitimate because any kind of transaction could be rung up as eligible food. (Doc. 28-6, ECF p. 100).

[37] Plaintiff admits this allegation but also asserts that "Shenandoah is a poor town and it is likely that invoices would be higher than a more affluent town." (Doc. 35, Pl.'s answer to DSMF ¶ 96). However, Plaintiff does not cite to the record to support this assertion nor does it attempt to explain its relevance to the comparison being made.

[38] Plaintiff says only that this statement is denied and fails to cite any evidence in support of its denial. (Doc. 35, Pl.'s answer to DSMF ¶ 97).

ARO Karagiorgos found that Shreegi could not adequately explain the

suspicious patterns of SNAP transactions, such as rapid and consecutive transactions

by customers during the same store visit or in a single day, based on sufficient

inventory alone, as the store inventory was limited and the same customers had

access to and did shop at larger and better stocked supermarkets. (Doc. 32, DSMF ¶

98, citing Doc. 28-6, ECF p. 100 through Doc. 28-7, ECF p. 1).[39]

ARO Karagiorgos concluded that Shenandoah Stop Shop was

not set up to provide for all of a SNAP participant's food needs. (Doc. 32, DSMF ¶

99, citing Doc. 28-7, ECF p. 1). Plaintiff denies this allegation, contending that it

did provide for all of a SNAP participant's food needs based on evidence that the

store would purchase items from other stores to sell to the customer if Plaintiff did

not have the item. (Doc. 35, Pl.'s answer to DSMF ¶ 99; Doc. 36, PCSMF ¶ 3,

citing Falguni Patel Dep., Doc. 49-1, ECF pp. 40-46).

---

[39] Plaintiff disputes this statement, contending that the evidence shows that "[i]n the beginning of the month when most benefit holders did their shopping, the store inventory was much greater. Customers did most of their shopping at Shreegi due to the fact that they did not drive and did not have access to larger supermarkets." (Doc. 35, Pl.'s answer to DSMF ¶ 98). Plaintiff cites in support Doc. 49-1, Falguni Patel Deposition at ECF pp. 39-46. The second statement is not supported by the record cited. Patel does say the store was busy the first two weeks of the month when everybody received their money and it was not so busy the last two weeks of the month. (Doc. 49-1, ECF p. 22, Falguni Patel Dep.).

ARO Karagiorgos rejected Shreegi's position that some of the suspicious transactions could be explained by the fact that their customers did not have vehicles and relied upon the store to purchase items that it did not stock from other stores for the customers' benefit. (Doc. 32, DSMF ¶ 100; admitted by Plaintiff). ARO Karagiorgos did not find this explanation convincing as there were nine other SNAP retailers within a one-mile radius of the store and an analysis of four households involved in the suspicious transactions revealed that those households were making regular purchases at super stores or supermarkets, sometimes on the same day as the suspicious transactions at Shenandoah Stop Shop. (Doc. 32, DSMF ¶ 101, citing Doc. 28-7, ECF p. 1).[40]

At the time of the administrative review, ARO Karagiorgos found that the store's SNAP redemptions dropped off dramatically (48% from the prior month) after receiving the Charge Letter. (Doc. 32, DSMF ¶ 102, citing Doc. 28-7, ECF p. 1; admitted by Plaintiff). At the time, this dramatic decrease in the store's SNAP

---

[40] Plaintiff admits that these findings are the opinion of ARO Karagiorgos, but denies that the findings are correct. (Doc. 35, Pl.'s answer to DSMF ¶ 101). However, Plaintiff cites no evidence to support its contention, and the record supports ARO Karagiorgos' findings. (Doc. 28-3, ECF pp. 54-56, Ahmed case analysis).

redemptions was unexplained by Plaintiff, and ARO Karagiorgos noted it is often indicative of trafficking.  (Doc. 32, DSMF ¶ 103, citing Doc. 28-7, ECF p. 1).

Plaintiff denies that the decrease is indicative of trafficking.  It attributes the decrease "to a big drug bust where almost ninety people in Shenandoah were arrested. . . . A number of the people who were arrested were customers who had been utilizing and shopping with SNAP which resulted in less customers at Shreegi."  (Doc. 35, Pl.'s answer to DSMF ¶ 103, citing Doc. 49-1, ECF pp. 53-55, Falguni Patel Dep.).

ARO Karagiorgos also considered Plaintiff's claim that the owner, Falguni Patel, was not aware of, nor did she approve of any trafficking.  (Doc. 32, DSMF ¶ 104, citing Doc. 28-7, ECF p. 2; admitted by Plaintiff).  ARO Karagiorgos noted that the store's ownership is accountable for proper handling of SNAP transactions, as per the signed SNAP authorization application.  (Doc. 32, DSMF ¶ 105, citing Doc. 28-7, ECF p. 2; admitted by Plaintiff).

ARO Karagiorgos concluded that the agency had established a *prima facie* case against the store with the four suspicious patterns and the store had failed to meet its burden of proving by a preponderance of the evidence that the

administrative action (disqualification) should be reversed.  (Doc. 32, DSMF ¶ 106, citing Doc. 28-7, ECF p. 2).[41]

### g.  Imposition of a CMP Rather Than Permanent Disqualification

ARO Karagiorgos reviewed Plaintiff's request for a CMP in lieu of permanent SNAP disqualification and agreed with the Retailer Operations Division that the store was not eligible for a CMP because it failed to meet the regulatory requirements of 7 C.F.R. § 278.6(i).  (Doc. 32, DSMF ¶ 107, citing Doc. 28-7, ECF p. 3).

Specifically, ARO Karagiorgos determined that Shreegi failed to establish that employees were provided with SNAP compliance training on their initial hire date; there was no evidence that employees were required to watch training videos; nor were there training agendas, logs or signed training certificates other than a four-page training manual that the employees had signed.  (Doc. 32, DSMF ¶ 108, citing Doc. 28-7, ECF p. 3).[42]

---

[41]    Plaintiff denies that it failed to meet its burden of showing by a preponderance of the evidence that the administrative action should be reversed.  (Doc. 35, Pl.'s answer to DSMF ¶ 106).

[42]    Plaintiff denies this statement by asserting that it did provide evidence "that it had an effective training program in place prior to the trafficking violation."  (Doc. 35, Pl.'s answer to DSMF ¶ 108).

ARO Karagiorgos determined that Shreegi did not present the substantial evidence necessary to establish that it had an effective employee training program in place prior to the trafficking violations. (Doc. 32, DSMF ¶ 109, citing Doc. 28-7, ECF p. 3). Plaintiff denies this allegation by relying on its delivery to Arif Ahmed of its four-page training manual signed by all four of its employees. (Doc. 35, Pl.'s answer to DSMF ¶ 109, citing Doc. 28, ECF p. 100 through Doc. 28-1, ECF p. 2, the training manual).

As further support that it had an effective employee training program, Plaintiff relies on the deposition of Falguni Patel. Patel testified that Plaintiff trains all the employees they hire so that they understand all of their responsibilities. (Doc. 49-1, ECF p. 18, Falguni Patel Dep.). Patel provides the training individually (a face-to-face sit down with the employee) and that is how it was done with SNAP. (*Id.*) The employee's signatures on the training manual indicate they received SNAP training. (*Id.*). Employees signed the manual in August 2014, (Doc. 49-1, ECF p. 23, Falguni Patel Dep.), so the date on the training manual, "8-14," is August 2014, not August 14. This means the employees signed the manual before the date of the violations cited in the Charge Letter.

ARO Karagiorgos also determined that Shreegi failed to establish that ownership was not aware of, or did not benefit from, the SNAP violations because the funds from the violative transactions were deposited in the owner's bank account during the SNAP EBT settlement process. (Doc. 32, DSMF ¶ 110, citing Doc. 28-7, ECF p. 4).[43] ARO Karagiorgos sustained the decision not to impose a CMP in lieu of permanent SNAP disqualification. (Doc. 32, DSMF ¶ 111, citing Doc. 28-7, ECF p. 4; admitted by Plaintiff).

## V. Discussion

### A. Whether Plaintiff Committed Trafficking Violations

In moving for summary judgment, Defendant argues that it has clearly established that Shreegi engaged in hundreds of EBT transactions supporting the conclusion that it was trafficking in SNAP benefits. As noted, the transactions came in four suspicious patterns. In the first pattern, 36 sets of transactions totaling $5,547.92 were rapid transactions, sets of two transactions from various households made within a small time span of each other. In the second pattern, 26 sets of

---

[43]    Plaintiff denies "there were any violative transactions." (Doc. 35, Pl.'s answer to DSMF ¶ 110). However, it does not deny that funds from the transactions at issue were deposited in its bank account.

transactions totaling $5,304.73 were rapid and repetitive transactions made within a short period of time from the same household, a pattern in which the household's EBT card was used repetitively within a 24-hour period. In the third pattern, 25 sets of transactions totaling $4,493.69 depleted the majority or all of a household's benefits in one or a few days. In the fourth pattern, a series of 195 EBT transactions totaling $21,076.87 averaged $35 each when the average convenience store transaction in Pennsylvania was $9, and the average transaction at Shreegi's was $15.02.

Defendant contends that Shreegi's explanation of the transactions is not sufficient, focusing on the documents Plaintiff supplied FNS in response to the Charge Letter: copies of store receipts from SNAP transactions from March 11-31, 2015; a spreadsheet summarizing all food purchases made by the store; and copies of inventory purchase receipts. Defendant argues these documents do not show that the transactions were valid for two reasons. First, 74 of the invoices did not fall within the review period. Second, of the 75 EBT receipts from the review period, most of the large purchases on the receipts were described as a "non-tax" item, a description too vague to determine if the transaction was legitimate.

In any event, Defendant argues that, even if Plaintiff had provided a sufficient explanation for a specific suspicious transaction, that still leaves unexplained "a substantial number of suspicious transactions," (Doc. 31, Def.'s Br. in Supp. at ECF p. 42), indicative of trafficking. Thus, Plaintiff has failed to meet its burden of showing that trafficking did not occur.

In opposition, Plaintiff first argues that there are disputes concerning four issues of material fact. Plaintiff then focuses on the four suspicious patterns of EBT transactions and argues why they are not indicative of trafficking.

The Court begins with Plaintiff's argument concerning the four factual issues. Plaintiff identifies the following four issues:

> a) Whether the Shenandoah Stop Shop was a grocery store or a convenience store;
>
> b) [A dispute over the] number of optical scanners, shopping baskets, shopping carts, cash registers, point of sale devices for processing EBT transactions;
>
> c) Whether the store sold meat, seafood, fruit, vegetables, dairy, bread, cereal, eggs, canned goods, meat, poultry, and fish items;
>
> d) Whether the store sold prepared/made-to-order items and alcoholic beverages for consumption at the premises and for take-out.

(Doc. 37, Pl.'s Br. in Opp'n at ECF p. 15).

Plaintiff says these factual issues are material because Ahmed relied on a mistaken understanding of them to decide that Shreegi had trafficked in EBT benefits. First, he decided that the store was a convenience store based on the erroneous statement in the 2015 compliance report that the store did not have optical scanners, shopping baskets or shopping carts. (Doc. 28, ECF p. 34, the 2015 compliance report).

Second, he decided that the store could not process EBT transactions in a short period of time based on the erroneous statement from the same report that the store had three cash register/check-out stations and three point-of-sale devices for processing EBT transactions (Doc. 28, ECF p. 34) when the store actually had three scanning cash registers and one device for processing EBT transactions.

Third, the compliance reviewer "incorrectly noted the store did not offer meat or seafood specials or fruit or vegetable boxes for sale when, in fact, various dairy, fruit and vegetable, bread and cereal, eggs, canned goods, and meat, poultry, and fish items were available at the store," in addition to "frozen bacon, pancakes, pizza, chicken strips, single serve frozen meals, and ice cream." (Doc. 37, Pl.'s Br. in Opp'n at ECF p. 16). When Ahmed decided that Plaintiff had trafficked in EBT

benefits, he relied on this incorrect statement that there was an absence of meat or seafood specials and boxes of fruits or vegetables.

Fourth, the compliance reviewer "did not realize that the building contained two businesses, Shreegi Enterprises, Inc., trading and doing business as Shenandoah Stop Shop, which was a grocery store, and Washington Ave Six Packs to Go, LLC, trading and doing business as Shenandoah One Stop Shop . . ." (*Id.*) The latter entity "sells prepared/made-to-order items and alcoholic beverages for consumption at the premises and for take-out." *Id.* Ahmed relied on the erroneous information that there was only one business entity on the premises in deciding that Shreegi engaged in trafficking.

On the first issue, Plaintiff says Shenandoah Stop Shop is a grocery store, not a convenience store. The Court agrees with Defendant that it is a convenience store. First, Plaintiff asserts that it is a grocery store but provides no facts to support this assertion.[44] Additionally, Plaintiff has admitted that Shenandoah Stop Shop is a convenience store. (Doc. 32, DSMF ¶ 1, admitted by Plaintiff).

---

[44] Plaintiff argues that Ahmed decided that the store was a convenience store based on the erroneous statement in the 2015 compliance report that the store did not have optical scanners, shopping baskets or shopping carts. The Court can find no support for this assertion in the record.

In its opposition brief (Doc. 37, ECF p. 7), Plaintiff does quote the inspector's report when the store was first being qualified for the SNAP. In that report, the inspector noted in a "comments" section beneath the "Store Type" section of the report that the store was "a combination general merchandise/grocery store . . . Located in an old coal mining town, where senior citizens and low income predominate." (Doc. 28, ECF p. 12). But the Court observes the inspector left blank the answer to a question asking what would be the "best description" of the store. Further, as part of its reply on summary judgment, Defendant submits the penalty-of-perjury declaration of Vicky Robinson, Chief, Retailer Management and Issuance Branch, Retailer Policy and Management Division of the U.S. Department of Agriculture, Food and Nutrition Service. She affirms that in May 2013, Shenandoah Stop Shop was classified as a convenience store, based on criteria set forth in 7 C.F.R. § 278.1(b), "and information the firm provided in their application dated March 11, 2013." (Doc. 47-1, Robinson Decl. ¶¶ 7-8). The Court will accept the Robinson declaration over what appears to be an ambiguous description of the store type in the inspector's report.

On the second factual issue, Defendant says that it recognized the factual dispute in its supporting brief and that, in any event, the dispute as to the number of

optical scanners, shopping baskets, shopping carts, cash registers, and point-of-sale devices for processing EBT transactions is immaterial because the second, third and fourth patterns do not rely on any facts related to these items to conclude that the pattern was suspicious of trafficking. Defendant adds that there need only be a single incident of trafficking to establish a violation and that the transactions are too numerous to be explained away by the number of optical scanners, shopping baskets, shopping carts, cash registers, and EBT transaction devices.

The Court agrees with Defendant that this factual dispute is immaterial to resolving the summary judgment motion for two reasons. As Defendant argues, there need be only one incident of trafficking for a permanent disqualification from the SNAP and, at the least, the second pattern does not rely on any facts related to these items to establish the suspicious nature of the transactions in that pattern.[45]

On the third factual issue, the Court agrees with Defendant there is no dispute. The FNS reviewer noted that, at the time of the visit, the store did not offer meat or seafood specials or fruit or vegetable boxes for sale. (*Id.*, DSMF ¶ 10, citing Doc.

---

[45] The Court notes, contrary to Defendant's position, that in her analysis of the third pattern transactions, ARO Karagiorgos relied in part on the absence of shopping carts or baskets (Doc. 28-6, ECF p. 99) and in her analysis of the fourth pattern transactions, she relied on the absence of carts. (Doc. 28-6, ECF p. 100 through Doc. 28-7, ECF p. 1).

28, ECF p. 34). As noted above, Plaintiff denied this allegation but provided no evidence to support its denial. Further, Plaintiff admitted that the store had a limited supply of fresh produce, and no fresh meat or seafood. (Doc. 32, DSMF ¶ 17, admitted by Plaintiff). Otherwise, Defendant agrees with Plaintiff that the store sold various dairy, fruit and vegetable, bread and cereal, and meat, poultry, and fish items, (*id.*, DSMF ¶¶ 12, admitted by Plaintiff), and that the store's staple food inventory included canned goods, bread, cereal, cheese, milk and eggs. (*Id.*, DSMF ¶ 15, admitted by Plaintiff).

On the fourth factual issue, the Court agrees with Defendant that the dispute is irrelevant to the case as Plaintiff was not disqualified for selling ineligible items but because, in Defendant's view, it could not explain the patterns of suspicious transactions. The Court adds that Plaintiff provides no evidence that Shenandoah Stop Shop is a separate entity from Shenandoah One Stop Shop. Additionally, Plaintiff admitted that it sold hot foods or foods for on-site consumption, had a deli or prepared food section containing prepared/made-to-order items and other refrigerated foods, (Doc. 32, DSMF ¶ 8, admitted by Plaintiff), and that its deli section was in a separate section that sold alcohol. (*Id.*, DSMF ¶ 9, admitted by Plaintiff). Plaintiff did not contend that these sales were by a different entity. In

any event, as noted immediately above, the factual dispute is simply irrelevant to the case.

The Court turns now to Plaintiff's argument focusing on the four patterns of suspicious EBT transactions.

### 1. The First Pattern: Sets of Two Transactions Made by Various Households Within a Small Time Span of Each Other

As noted, the first pattern is 36 sets of rapid and repetitive transactions, totaling $5,547.92, made within a short period of time by various households, (Doc. 32, DSMF ¶ 19, citing Doc. 28, ECF pp. 77-84, admitted by Plaintiff), most of them coming within two minutes of each other. (Doc. 32, DSMF ¶ 20, citing Doc. 28-3, ECF p. 49).

FNS found this suspicious given the numerous steps involved for a cashier in making and processing a legitimate purchase, including the cashier's manually handling the item to determine the price in the absence of an optical scanner, the manual keying of amounts into the register, and bagging the items. *See Rockland Convenience Store, supra,* 2011 WL 5120410, at *6 ("A subsequent transaction is suspicious to FNS when it appears implausible or impossible for an employee at a store's check-out counter to have physically handled the number of items necessary

to achieve the value of the transaction in the amount of time in which . . . the transaction took place.").

Defendant highlights two examples. In one instance, a $185.50 transaction for one household was followed less than two minutes later by a $116.80 transaction for another household. (Doc. 32, DSMF ¶ 22, citing Doc. 28, ECF p. 81, transactions 17 and 18; admitted by Plaintiff). In another instance, one transaction of $44.79 is followed 30 seconds later by a second transaction of $287.10 for another household. (Doc. 32, DSMF ¶ 23, citing Doc. 28, ECF p. 82, transactions 37 and 38; admitted by Plaintiff).

Plaintiff asserts that the pattern is not suspicious because it is possible for one of its employees to process two valid transactions within a few minutes of each other. This could happen because it was a common practice for its customers to place orders in advance. An employee would ring up the items, scan them into the computer, put them in a bag, and write the total on the receipt. When the customer came in to pick the order up, the employee only had to recall the invoice from any of the three cash registers and then process the transaction immediately through the EBT system. Two SNAP purchases could be processed in a small window of time because an employee could view a recall (of any order already rung up) at any

register, do the recall, and then swipe the order through the EBT device. (Doc. 37, Pl.'s Br. in Opp'n at ECF pp. 19-20).

Plaintiff did not raise this argument before the agency, and Defendant does not specifically respond to it in its reply brief, only referring the Court back to its supporting brief for why it rejected Plaintiff's explanations of the transactions before the agency, that is, that the time between the two transactions in each set was too brief, given all the steps a cashier had to take to process a legitimate transaction.

As noted, even a single incident of trafficking requires permanent disqualification, *Rockland Convenience Store, supra,* 2011 WL 5120410, at *9, absent eligibility for a CMP instead. 7 U.S.C. § 2021(b)(3)(B). And to survive summary judgment, Plaintiff must raise material issues of fact as to each alleged violation. *Ganesh*, *supra*, 658 F. App'x at 219. Further, "general statements about customers' shopping patterns or other customer practices are not enough to create a triable issue of fact." *J & L Liquor, Inc. v. United States*, No. 16-CV-10717, 2017 WL 4310109, at *6 (E.D. Mich. Sept. 28, 2017)(cited cases omitted). Plaintiff thus appears to have not met its burden on summary judgment. Nonetheless, the Court declines to grant Defendant summary judgment on the first pattern. Both FNS and ARO Karagiorgos relied on the nature of the equipment they thought was available

to a cashier in deciding the first pattern was suspicious.  It may not be necessary to

decide whether this pattern shows trafficking if examination of the other transaction

patterns allows a solid conclusion about trafficking.

### 2.  The Second Pattern: Rapid and Repetitive Transactions in a Short Period of Time from the Same Household Account, a Pattern in which the Household's EBT Card Was Used Repetitively Within a 24-Hour Period

As noted, the second pattern was 26 sets of rapid and repetitive transactions,

totaling $5,304.73, made within a short period of time from the same household, a

pattern in which the household's EBT card was used repetitively within a 24-hour

period.  (Doc. 32, DSMF 24, citing Doc. 28, ECF pp. 85-87; admitted by Plaintiff).

In one set of transactions, a household account conducted a transaction for $151.09,

which was followed 57 seconds later by a transaction for $149.98 for the same

account.  (Doc. 32, DSMF ¶ 25, citing Doc. 28, ECF p. 85, transactions 73 and 74;

admitted by Plaintiff).  In another set, a transaction for $149.50 was followed 20

minutes later by a transaction for $101.50 from the same account.  (Doc. 32, DSMF

¶ 26, citing Doc. 28, ECF p. 85, transactions 87 and 88; admitted by Plaintiff).  In

another instance, a household recorded a transaction of $266.20, then a second

transaction of $27.34, a third transaction of $252.49, and a fourth transaction of

$141.45, all in less than 24 hours.  (Doc. 32, DSMF ¶ 27, citing Doc. 28, ECF p. 87, transactions 119 through 122; admitted by Plaintiff).  FNS has found that multiple transactions such as these are methods stores use to avoid high-dollar transactions and are suggestive of trafficking.

ARO Karagiorgos provided additional reasons for suspecting these transactions: (1) while it is not unusual for SNAP participants to have more than one transaction per day, it is not common for those multiple transactions to be as large as they were at Shenandoah Stop Shop; (2) the March 2015 store visit by the compliance reviewer did not offer any compelling reason why SNAP customers would make multiple purchases at the store within the same day because the store did not have a "great variety of products, price advantage . . . significant bulk items for sale"; and (3) the same SNAP participants that made the Pattern Two transactions were also shopping at stores that were larger and had a better inventory than Shenandoah Stop Shop.

Plaintiff denies these transactions are evidence of trafficking.  "Shenandoah is a poor town and most of Shreegi's customers anxiously await[ ] . . . their funds to arrive on their [EBT] cards" at the beginning of the month.  (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 20).  Plaintiff is very busy at the beginning of the month.  Thus,

according to Plaintiff, customers would place their orders ahead of time. When a customer arrived at the store to pick up his order, he would often shop for other items and purchase them under a separate transaction. Therefore, it was not uncommon for one household to make more than one transaction in a short period of time. (Doc. 37, Pl.'s Brief in Opp'n at ECF pp. 20-21).

Plaintiff also asserts the town's poverty and the consequent need of Plaintiff's customers for their EBT benefits would explain why the transaction amounts were so high at the store. (Doc. 35, Pl.'s answer to DSMF ¶ 84, citing Doc. 28, ECF p. 99, Plaintiff's lawyer's letter of May 13, 2015). Plaintiff also contends that "many people do not have vehicles to drive to other stores, therefore they make multiple large purchases multiple times at Shreegi," again citing the lawyer's letter. (*Id.*). Plaintiff also denies that the store visit by the compliance reviewer would not support the notion that a SNAP beneficiary would make multiple purchases on the same day "because the store visit was on March 26, 2015, when the inventory was low." (Doc. 35, Pl.'s answer to DSMF ¶ 85).

Additionally, Plaintiff says the transactions are not unusual because many customers would typically use the funds within the first day or two when funds became available to get everything they needed for the whole month. (Doc. 35, Pl.'s

answer to DSMF ¶ 25). To support this statement, Plaintiff relies on Falguni Patel's testimony that was not unusual to see the set of four transactions with the amounts mentioned above since some people ("a handful of people basically") "had lots of funds." (Doc. 49-1, ECF p. 41, Falguni Patel Dep.). They would use their SNAP funds in the first week or day or two, buy everything that they want, and that would be it. They would have $100 or less left "for other stuff." (*Id.*). At the beginning of the month, three purchases within 24 hours after an initial transaction by the same household was not unusual for Shenandoah for the amounts mentioned; at the end of the month, it would be different. (*Id.* at ECF pp. 39-40).

The Court believes that Plaintiff has not carried its burden on summary judgment on the second pattern of EBT transactions. As noted, Plaintiff has to raise material issues of fact as to each alleged violation. The evidence to support the validity of the transactions in the second pattern goes only to its customers' general shopping practices, which is not enough. See *J & L Liquor, supra*, 2017 WL 4310109, at *6. For example, to support its assertion that customers would often buy additional items in a second transaction after their arrival at the store, Plaintiff relies on the deposition of employee Tiffany Becker. (Doc. 36-2, ECF p. 4, Becker Dep.). But Becker could only testify generally that "at times" customers purchased

items under a separate transaction, and she did not know how often that would happen. (*Id.*).[46] The same analysis applies to Falguni Patel's testimony. She testified that only "a handful of people basically" would use their SNAP funds to make multiple transactions in the first week or day or two. The general nature of this testimony, which does not specifically explain the 26 sets of suspicious transactions, fails to show by a preponderance of the evidence that a pattern-two violation did not occur.

Finally, Plaintiff argues with respect to the second pattern that Ahmed did not take into account that EBT beneficiaries spend more at the beginning of the month when their cards are replenished. (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 21). Actually, he testified that he *did* take this into consideration but that he did not necessarily take into account what percentage of a store's sales were EBT transactions. (Doc. 36-3, ECF pp. 6-8, Ahmed Dep.).

Plaintiff has failed to meet its burden in connection with the pattern-two transactions.

---

[46] The Court adds that Falguni Patel also testified that customers would want to make additional purchases but that she gave as an example "two ice teas." (Doc. 49-1, ECF p. 38, Falguni Patel Dep.). In the first few examples, the second transaction was for far more than the cost of a couple of ice teas. Also, Patel's testimony may explain a second transaction but not a third or fourth.

### 3.  The Third Pattern: Transactions Depleting the Majority or All of a Household's Benefits in One or a Few Days

The third suspicious transaction pattern was the depletion of the majority or all of a household's benefits in a short time frame.  (Doc. 32, DSMF ¶ 29, admitted by Plaintiff).  There were 25 sets of suspicious transactions involving 16 households totaling $4,493.69.  (Doc. 32, DSMF ¶ 30, admitted by Plaintiff).  One account depleted its balance from $355.31 to $35.03 through a series of five transactions that occurred on the same day.  (Doc. 32, DSMF ¶ 31, citing Doc. 28, ECF p. 88, transactions 125 through 129; admitted by Plaintiff).  FNS identified at least five other examples of a household depleting its balance in one or two transactions at Shenandoah Stop Shop.  (Doc. 32, DSMF ¶ 32, admitted by Plaintiff).

FNS has found that depleting a household's entire allotment in one or a few transactions or within one or two days, leaving little or no benefits for the rest of the month, is inconsistent with normal shopping patterns of SNAP households and is often indicative of trafficking.  *See also Ganesh, supra*, 658 F. App'x at 218 ("the FNS identified many transactions where a customer would spend nearly all of his or her monthly SNAP allotment within a very short timeframe, a pattern that is inconsistent with typical SNAP recipient behavior").

ARO Karagiorgos agreed with this reasoning and added that the store "is not set up to provide all of one's food needs and lacks an abundant depth and breadth of staple foods." (Doc. 32, DSMF ¶ 90, citing Doc. 28-6, ECF p. 99). She also stated: "That SNAP households would spend large amounts of their limited benefit allotments at [the store], a store that has no shopping carts or hand baskets, very little counter space at checkout, and sells limited staple foods that promote a healthy diet as opposed to a profusion of accessory food typical of convenience store offerings strains credulity." (Doc. 31, Def.'s Br. in Supp. at ECF p. 31, citing Doc. 28-6, ECF p. 99).

Plaintiff argues this pattern is not suspicious because, as noted above, Shenandoah is a poor town "and many people have to wait" for their funds to arrive on their EBT cards "to make all or most of their food purchases." (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 21). Plaintiff asserts that since "many of Shreegi's customers do not have sufficient funds to last the entire month . . . they choose to buy everything they need for the month when they first receive their funds." (*Id.*, at ECF pp. 21-22). Consequently, "it is not unusual or suspicious for one household to deplete their EBT funds in a short period of time." (*Id.*, at ECF p. 22).

Plaintiff's argument is not sufficient, even when the Court discounts ARO Karagiorgos' reliance on the absence of shopping carts and baskets.[47] As noted, Plaintiff has to raise material issues of fact as to each alleged violation. Even if the Court assumes that Plaintiff's assertions are evidence, evidence that "many of Shreegi's customers" have to deplete all of their SNAP benefits in a short period of time, is based on the customers' shopping practices. And just as with the second pattern, it is not enough. See *J & L Liquor, supra*, 2017 WL 4310109, at *6.

In support of its position on the third pattern, Plaintiff has also argued that Ahmed admitted there was a possibility his decision would change if he was aware of these facts, that is, Shenandoah is a poor town where many people have to wait for their funds to arrive on their EBT cards to make all or most of their food purchases and since many of Shreegi's customers do not have sufficient funds to last the entire month, they choose to buy everything they need for the month when they first receive their funds. (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 22).

The Court disagrees. The cited portion of Ahmed's deposition does not support Plaintiff. Ahmed was asked if would change his evaluation if the store

---

[47] The evidence must be viewed in the light most favorable to Plaintiff, the nonmoving party. Plaintiff has presented evidence that the store did have shopping carts and baskets. (Doc. 36, PCSMF ¶¶ 11 and 12).

owner testified that: (1) in the first week of the month the store would shop for its customers; (2) people would give the store shopping lists; and (3) the customers would come to the store when their EBT card was replenished and pick up their items. (Doc. 36-3, ECF p. 9, Ahmed Dep.). Ahmed said that "[i]f they can prove [to] me what they did," it was possible his evaluation would change. (*Id.*). This questioning has nothing to do with the argument Plaintiff raises.

The Court concludes that Plaintiff has failed to meet its burden of showing by a preponderance of the evidence that each of the pattern-three transactions was not part of a trafficking violation.

4. **The Fourth Pattern: a Series of EBT Transactions that Were Excessively Large Compared to the Average Convenience Store Transaction in Pennsylvania**

FNS found a series of EBT transactions that were excessively large in amount compared to the average convenience store transaction in Pennsylvania. FNS considers such excessively large transactions evidence of trafficking. *See Ganesh*, 658 F. App'x at 218-19. Specifically, the average transaction at a convenience store in Pennsylvania during the review period was about $9.00, while 195 out of 2,625 transactions at the Shenandoah Stop Shop during the review period were for more

than $35, which is 300% above the state average.  (Doc. 32, DSMF ¶ 36, citing Doc. 28-3, ECF p. 51, Ahmed case analysis; admitted by Plaintiff).  The average transaction at the store during the review period was $15.02, which is 69% above the state average.  (Doc. 32, DSMF ¶ 37, citing Doc. 28-3, ECF p. 51, Ahmed case analysis; admitted by Plaintiff).

FNS provided other reasons why the transactions were suspicious.  First, the March 2015 store compliance visit did not reveal any expensive food or other specialty items that FNS believed would justify the large average amount of each EBT transaction.  (Doc. 32, DSMF ¶ 38, citing Doc. 28-3, ECF p. 51, Ahmed case analysis: "the store layout and inventory do not support such a high percentage of transactions markedly exceeding the average transaction amount of similar stores.").

Second, FNS found that the pictures and visible inventory from the March 2015 store compliance visit did not support the high percentage of the store's transactions that exceeded the average convenience store transactions in Pennsylvania.  (Doc. 32, DSMF ¶ 66, citing Doc. 28-3, ECF p. 62).

Third, other SNAP-authorized stores were within a one-mile radius of the store; there were two small grocery stores, one supermarket, two combination stores, and four other convenience stores that were authorized to accept SNAP benefits.

(Doc. 32, DSMF ¶ 39, admitted by Plaintiff). Patterns at Shenandoah Stop Shop exhibited "an excessive number of high dollar transactions" given that the store does not sell any unique items that cannot be purchased at the other stores in the area. (Doc. 32, DSMF ¶ 40, citing Doc. 28-3, ECF pp. 52-54; admitted by Plaintiff).

Fourth, FNS examined the shopping patterns of four households during the review period that were involved in some of the suspicious transactions. In each case, the households had access to and did in fact shop at larger, better stocked supermarkets and grocery stores, yet the households still spent substantial sums of SNAP benefits at Shenandoah Stop Shop, which FNS believed indicated possible trafficking. (Doc. 32, DSMF ¶ 41, citing Doc. 28-3, ECF pp. 54-56; admitted by Plaintiff).

Plaintiff argues that Ahmed's conclusion that this is a pattern indicative of trafficking rests upon errors in both the May 2013 inspection report and the March 2015 compliance report. Specifically, both reports erroneously stated that the store had no optical scanners, and the compliance report erroneously stated the store had no shopping baskets or shopping carts. In fact, (at least on the summary judgment record) the store had both carts and baskets and three cash registers with three scanners and one EBT device.

On the food supply at the store, Plaintiff contends the compliance reviewer also erroneously reported that the store did not offer meat or seafood specials or fruit or vegetable boxes for sale, and Ahmed admitted, after being shown photographs of the store, that the store had vegetables, onions and lettuce, citing Doc. 36-3, ECF pp. 4-5, Ahmed Dep. Further, Ahmed acknowledged that because the inspection took place on March 26, 2015, he had no way of knowing what the shelves looked like in the first week of the month (*Id.*, ECF p. 8) when, Plaintiff asserts, the store had the majority of its sales. As Plaintiff has also stated, because the store visit happened on March 26, 2015, the shelves were in the process of being restocked, (Doc. 28, ECF p. 35, compliance report), thereby explaining the smaller amount of inventory seen during the visit.

Plaintiff also argues that Ahmed made the following mistakes in considering the size of the EBT transactions. First, he failed to consider that 50% of Shreegi's customers did not drive regularly. (Doc. 49-1, ECF p. 43, Falguni Patel Dep.). The customers therefore spent most of their benefits at the store, increasing the average amount of each EBT transaction, citing Doc. 49-1, ECF pp. 43-45, Falguni Patel Dep. Second, the average size of each EBT transaction at the store was elevated. This was caused by the fact that "many times" the store would drive customers

home who had a large quantity of merchandise, a large quantity of merchandise indicating the transaction was in a large amount. (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 24, citing Doc. 49-1, ECF p. 44, Falguni Patel Dep.). Third, Plaintiff contends, citing the May 2013 inspection report, that "Shenandoah is a very poor town compared to other towns in the state." (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 24). Plaintiff argues that based on "the poverty in the area and the demographics of Shreegi's customers, the higher purchase average of this convenient (sic) store is not unusual or suspicious." (*Id.*).

The Court begins with Plaintiff's argument concerning the food supply at the store. Plaintiff incorrectly asserts that the store offered meat and seafood specials and fruit or vegetable boxes for sale. The record shows that Plaintiff did not have these food items for sale. (Doc. 32, DSMF ¶ 10, citing Doc. 28, ECF p. 34). The store also did not sell fresh meat or seafood. (*Id.*, DSMF ¶ 17, admitted by Plaintiff). As for Ahmed's deposition testimony, he did admit that photographs showed onions and "some kind of vegetables" but said nothing about the quantity of vegetables the store had. (Doc. 36-3, ECF pp. 4-5, Ahmed Dep.). Further, while Ahmed acknowledged that because the inspection took place on March 26, 2015, he had no way of knowing what the shelves looked like in the first week of the month,

(*id.*, ECF p. 8), this fact misses the point that the store had no high-priced items that would increase the average EBT transaction.

Plaintiff's argument based on the nature of its customers is also not sufficient. As noted, Plaintiff has to raise material issues of fact as to each alleged violation and it is not enough to show its customers' general shopping practices. See *J & L Liquor, supra*, 2017 WL 4310109, at *6. An argument based on the following is one based on its customers' general shopping practices: 50% of Shreegi's customers did not drive regularly; and the average size of each EBT transaction at the store was elevated because "many times" the store would drive customers home who had a large quantity of merchandise.

Plaintiff correctly notes that in deciding that Pattern Four indicated trafficking both Ahmed and ARO Karagiorgos relied in part on erroneous understandings as to the number of cash registers, scanners, shopping carts and shopping baskets. In his case analysis on this pattern, Ahmed noted that: "The store has two cash registers and one POS device with very minimal counter space which limits the feasibility of large transactions." (Doc. 28-3, ECF p. 62). In her Final Agency Decision, ARO Karagiorgos noted: "It is not plausible that the firm's customers are carrying a large amount of food merchandise around the store without the benefit of shopping carts

or shopping baskets." (Doc. 28-7, ECF p. 1). Nonetheless, the Court finds these facts to be insufficient for Plaintiff to meet its burden of creating an issue of material fact as to each violation.

Plaintiff also did not adequately respond to the evidence concerning the shopping patterns of four households during the review period that were involved in some of the suspicious transactions. In each case, the households had access to and did in fact shop at larger, better stocked supermarkets and grocery stores, yet the households still spent substantial sums of SNAP benefits at Shenandoah Stop Shop, which FNS believed indicated possible trafficking. (Doc. 32, DSMF ¶ 41, citing Doc. 28-3, ECF pp. 54-56; admitted by Plaintiff).[48]

Plaintiff's response to this is to note that most of the shopping occurred at Shreegi. Household One shopped at Shreegi eleven times and other stores three times between January and March 2015. Household Two shopped at Shreegi nineteen times and other stores three times during the three-month period. Household Three shopped at Shreegi thirteen times and other stores seven times during the three-month period. Household Four shopped at Shreegi five times and

---

[48]     ARO Karagiorgos' reference to access to larger and better stocked supermarkets also negates Plaintiff's claim that poverty in the area and the demographics of its customers raise the average purchase amount.

other stores four times during the three-month period. (Doc. 35, Pl.'s answer to DSMF ¶ 67, citing Doc. 28-3, ECF pp. 55-56, Ahmed case analysis).

The Court fails to see the relevance of this observation as the Defendant's point is that households had access to and did in fact shop at larger, better stocked supermarkets and grocery stores, but still spent substantial sums of SNAP benefits at Shenandoah Stop Shop.

On the fourth pattern, Plaintiff also relies on the store receipts it supplied FNS from SNAP transactions during March 11-31, 2015. Plaintiff asserts these receipts show the items purchased met SNAP requirements. Plaintiff also relies on the spreadsheet it supplied to FNS summarizing all food purchases made by the store and copies of inventory purchase receipts it also supplied.

The Court rejects this argument based on Defendant's reasoning. As Defendant notes, of the 75 EBT receipts produced for the review period, most included a "non-tax" item, but provided no further description; thus it was impossible to determine if these represented valid transactions. In many cases, the "non-tax" item was the most expensive item on the receipt.[49]

_____

[49]     Plaintiff asserts "the majority of the customers would purchase groceries at Shreegi" and "[g]roceries are non-taxable items. The majority of the taxable items were purchased at the Shenandoah One Stop which is adjacent to Shreegi." (Doc. 35, Pl.'s answer to

In regard to the inventory invoices, ARO Karagiorgos reviewed them to determine if they would support the $39,420.65 in total SNAP redemptions during the review period. ARO Karagiorgos concluded that the $31,417.56 in eligible food purchases from the invoices did not support the total SNAP redemptions ($39,420.65).

Plaintiff had a stringent standard to satisfy; it had the burden of raising a material issues of fact as to each alleged violation. It failed to do so in regard to the pattern-four transactions. Based on this conclusion and the Court's conclusion as to patterns two and three, Plaintiff has failed to show that it did not engage in the illegal trafficking of SNAP benefits. The Court turns now to whether FNS's decision to deny a CMP in lieu of permanent disqualification from the SNAP was arbitrary or capricious.

**B. Whether a CMP Should Have Been Imposed Rather Than Permanent Disqualification**

A store's first trafficking violation requires permanent disqualification from the SNAP, 7 U.S.C. § 2021(b)(3)(B), except that there is discretion to impose a

---

DSMF ¶ 69). However, Plaintiff cites no evidence to support this statement.

CMP instead if "there is substantial evidence that such store or food concern had an effective policy and program to prevent violations . . . ." *Id.*

The governing regulation is 7 C.F.R. § 278.6(i). It provides that "FNS may impose a civil money penalty in lieu of a permanent disqualification for trafficking . . . if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program." *Id.*[50]

> In determining the minimum standards of eligibility of a firm for a civil money penalty in lieu of a permanent disqualification for trafficking, the firm shall, at a minimum, establish by substantial evidence its fulfillment of each of the following criteria:
>
> Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and
>
> Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

---

[50] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The term means more than a scintilla, but less than a preponderance of the evidence." *Affum*, 566 F.3d at 1162-63 (internal quotation marks and quoted cases omitted).

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; . . . .

7 C.F.R. § 278.6(i).

In determining whether a store has developed an "effective compliance policy" as mentioned in Criterion 1, both parties note that "FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with" the regulations. *Id.* § 278.6(i)(1).

In determining whether the firm has both an effective policy and program, Defendant notes that FNS may consider "[d]ocumentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating" the regulations. *Id.* § 278.6(i)(1)(i). And both parties note in regard to an effective training program that the firm should "document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted . . . ." *Id.* § 278.6(i)(2).[51] Plaintiff adds that, "in evaluating the effectiveness of the firm's policy and program . . . FNS may

---

[51] In addition, the regulation provides in regard to an effective training program that the firm shall also submit "a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s)." *Id.*

consider . . . "[a]ny other information the firm may present to FNS for consideration." *Id.* § 278.6(i)(1)(vi).[52]

The Court notes that the regulation also says a training program will be considered effective:

if it meets or is otherwise equivalent to the following standards:

(i) Training for all managers and employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed shall be conducted within one month of the institution of the compliance policy under Criterion 1 above. Employees hired subsequent to the institution

---

[52] In addition, other factors on evaluating the effectiveness of a firm's policy and training program are:

. . . .

(ii) Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of . . . violations or irregularities committed by firm personnel;

(iii) Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with [the] regulations;

(iv) The nature and scope of the violations charged against the firm;

(v) Any record of previous firm violations under the same ownership; . . .

7 C.F.R. § 278.6(i)(1)(ii-v).

of the compliance policy shall be trained within one month of employment. All employees shall be trained periodically thereafter;

(ii) Training shall be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278;

(iii) Written materials, which may include FNS publications and program regulations that are available to all authorized firms, are used in the training program. Training materials shall clearly state that the following acts are prohibited and are in violation of the Food and Nutrition Act of 2008 and regulations: the exchange of food coupons, ATP cards or other program access devices for cash; and, in exchange for coupons, the sale of firearms, ammunition, explosives or controlled substances, as the term is defined in section 802 of title 21, United States Code.

7 C.F.R. § 278.6(i)(2)(i-iii).

In deciding that Plaintiff was not entitled to a CMP in lieu of permanent disqualification, ARO Karagiorgos determined that Shreegi failed to establish that employees were provided with SNAP compliance training on their initial hire date; there was no evidence that employees were required to watch training videos; nor were there training agendas, logs or signed training certificates other than the four-page training manual that the employees had signed. (Doc. 32, DSMF ¶ 108, citing Doc. 28-7, ECF p. 3). ARO Karagiorgos also determined that Shreegi failed to establish that ownership was not aware of, or did not benefit from, the SNAP

violations because the funds from the violative transactions were deposited in the owner's bank account during the SNAP EBT settlement process. (Doc. 32, DSMF ¶ 110, citing Doc. 28-7, ECF p. 4).

In moving for summary judgment on the CMP issue, Defendant argues that Plaintiff failed to present substantial evidence that it had an effective policy and program to prevent violations. It reiterates the following points made by ARO Karagiorgos. First, Shreegi only presented the four-page training manual. Second, Plaintiff failed to produce the following: (1) evidence that Plaintiff provided employees with SNAP compliance training on the date they were hired; or (2) evidence of SNAP training agendas or training videos. Defendant adds that the manual devoted only about one page to SNAP training and was signed by all employees on "8-14," an ambiguous indication of the date, meaning to Defendant either August 2014 or the eighth day of an unspecified month in 2014. Further, Defendant argues that it appears from the date on the training manual Shenandoah Stop Shop did not have a compliance training program in effect when it became an authorized SNAP retailer on May 21, 2013. Defendant maintains that, because Plaintiff presented no evidence it had an effective compliance policy, and it was much more likely that no such policy was in effect, permanent disqualification was

not only permissible but mandated by the statute.  Defendant adds that disqualification was not arbitrary or capricious, the standard of review the court must employ in reviewing FNS's decision not to impose a CMP.

In opposing summary judgment, Plaintiff argues it met all four criteria for an effective compliance policy and program.  First, Shreegi had an effective compliance policy in place as required by Criterion 1.  Plaintiff bases this on Falguni Patel's creation of the four-page training manual, which included information regarding the SNAP regulations, and her deposition testimony that the employees signed it in August 2014.  Plaintiff argues this establishes an effective compliance policy pursuant to § 278.6(i).[53]  As noted above, in determining whether a store has developed an "effective compliance policy" as mentioned in Criterion 1, "FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with" the regulations.  *Id.* § 278.6(i)(1).

Second, Shreegi maintains it met Criterion 2, which requires both its compliance policy and program be in operation prior to the occurrence of the

---

[53]  Plaintiff represents that Falguni Patel testified that she created an "effective" training policy, but the Court can find no support in the record for this assertion.

violations cited in the charge letter. Plaintiff notes that the charge letter, dated May 4, 2015, listed violations that occurred from January through March of 2015, a time frame after the employees received SNAP training in August 2014.[54]

Third, Shreegi maintains it met Criterion 3, which requires that it institute an effective personnel training program. It relies on the following. Falguni Patel provided individual training on the SNAP. (Doc 49-1, ECF p. 18, Falguni Patel Dep.). The employees' signatures on the manual show that they received SNAP training. (Doc 49-1, ECF p. 18, Falguni Patel Dep.). The training manual (Doc. 28, ECF p. 100 through Doc. 28-1, ECF p. 2) addressed the rules and regulations of the SNAP.[55] Directly above the employees' signatures the training manual stated: "Most important points of any EBT transactions: never allow any ineligible items on the food side of an EBT card, never allow cash back on the food side of an EBT card, and should you ever make a mistake of any kind regarding ineligible items, immediately contact the management to correct errors before the client leaves the

_____

[54] Plaintiff asserts that their signatures also indicate that they understood the requirements set forth in the policy, but the record cited, (Doc. 49-1, ECF p. 18, Falguni Patel Dep.), does not support the assertion.

[55] Plaintiff also notes the manual addressed Pennsylvania Liquor Control Board law, law regarding tobacco sales, and the regulations relating to the Woman and Infant Children Nutrition Program (WIC).

counter. Any violation of the above regulations shall be a cause for immediate dismissal." (Doc. 28-1, ECF p. 2).[56] Plaintiff argues that "this Court should conclude that Shreegi instituted an effective personnel training program which meets the requirements of § 278.6(i)(2)," thereby satisfying the requirements of Criterion 3. (Doc. 37, Pl.'s Brief in Opp'n at ECF p. 29).[57]

Fourth, Plaintiff maintains it has satisfied Criterion 4 because the evidence shows that it's "ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations." 7 C.F.R. § 278.6(i). Plaintiff points to Ahmed's testimony where he acknowledges that he had no evidence that Falguni Patel engaged in trafficking (Doc. 50, ECF p. 2,

---

[56] Plaintiff made two other factual assertions in this argument: (1) "If the employees were unable to read the training manual, Falguni Patel would read it to them during their training"; and (2) "After the training manual was signed by all four employees it remained at the premises to show that all the employees had read the manual and received proper training." However, the cited portion of the record, (Doc. 49-1, ECF p. 18, Falguni Patel Dep.), does not support the first assertion, and a search of the record does not reveal support for the second.

[57] Slightly aside from the argument on the merits, Plaintiff points to the deposition testimony of Ahmed where he states: "[t]o me, this was signed to prepare this response, because they are all signed the same date." (Doc. 36-3, ECF p. 11, Ahmed Dep.) Plaintiff contends that if the court finds this statement credible, there would be a material issue of fact precluding the grant of summary judgment. This is incorrect. The Court may otherwise decide that Plaintiff has failed to establish an effective training program.

Ahmed Dep.) and asserts that Falguni Patel testified she was not involved in trafficking.[58]

Based on the foregoing, Plaintiff argues it is entitled to pay a CMP rather than suffer permanent disqualification from the SNAP.

In reply, Defendant argues that Plaintiff has not met its burden by presenting self-serving statements from its counsel that it had an effective compliance policy and program. Defendant contends that Plaintiff is essentially relying on an internal four-page manual with only one page devoted to SNAP requirements. Defendant maintains this single page is not substantial evidence of an effective compliance policy and training program, even when combined with counsel's statement that its compliance policy and program were effective.

The Court cannot grant Defendant summary judgment on this record. Defendant denigrates the training manual. It is true that the manual is only four pages long, and only a little over one page is devoted to the SNAP. Nonetheless, the manual does convey the important limitations on SNAP transactions: (1) an EBT card can be used only to purchase food for preparation at home; (2) certain food

_____

[58]    The Court can find no support in the record for the latter assertion. However, it is nonetheless true that there is no evidence in the record that she was involved in trafficking.

-82-

items and non-food items are not eligible; and (3) customers can never receive cash in an EBT transaction. (Doc. 28-1, ECF p. 1, training manual). Further, the manual warns that allowing an EBT card to be used to purchase ineligible items or to receive cash in return is cause for immediate dismissal. (Doc. 28-1, ECF pp. 1-2).[59]

Defendant also points out that the employees signed the manual on "8-14," an ambiguous indication of the date. However, the record before the court contains evidence from Falguni Patel, which the Court must accept for summary judgment purposes, that the notation means August 2014. Defendant also argues that it appears from the date on the training manual Shenandoah Stop Shop did not have a compliance training program in effect when it became an authorized SNAP retailer on May 21, 2013. However, Defendant does not cite any regulation that requires a training program to be in effect when a store becomes an authorized SNAP retailer (although such a program would be greatly beneficial). Instead, a regulation allows training to occur within one month of the institution of the compliance policy. 7 C.F.R. § 278.6(i)(2)(i-iii).

---

[59]    The manual does leave out required language stating that it is illegal to exchange SNAP benefits for "firearms, ammunition, explosives or controlled substances as the therm is defined in section 802 of title 21, United States Code." 7 C.F.R. § 278.6(i)(2)(iii).

Defendant further argues that Plaintiff failed to produce the following: (1) evidence that Plaintiff provided employees with SNAP compliance training on the date they were hired; and (2) evidence of SNAP training agendas or training videos. Again, Defendant does not cite a regulation that imposes such requirements for an effective training program. A regulation allows training within one month of an employee's hiring. 7 C.F.R. § 278.6(i)(2)(i). The same regulation allows the use of written materials, not just videos, and the written materials need not be FNS publications. *Id.* § 278.6(i)(2)(iii). In these circumstances, the Court must conclude that Defendant acted arbitrarily or capriciously in not imposing a CMP in lieu of permanent disqualification. A sanction is arbitrary or capricious if it is unwarranted in law. *Affum*, 566 F.3d at 1161. Here, FNS relied on factors that have no basis in the relevant law. The Court observes that, while ARO Karagiorgos stated that Plaintiff had failed to satisfy Criterion 4 by benefitting from the trafficking, Defendant did not argue that point in contending that refusal to impose a CMP was proper.

The Court also notes that Plaintiff seems to have provided substantial evidence that it has met all four criteria to be considered for a CMP. First, Criterion 1 appears to be satisfied by the training manual, which can serve as a written and

dated statement of firm policy regarding its commitment to enforcing SNAP

regulations.  Second, Criterion 2 may also be satisfied by the training manual, which

shows that the compliance policy  and program were in effect before the violations.

Third, Criterion 3, requiring an effective personnel training program as

specified in 7 C.F.R. § 278.6(i)(2), may be satisfied by the evidence that Falguni

Patel provided individual training on the SNAP and that the employees signed the

manual, showing that they received SNAP training.  As noted above, the training

manual addressed the rules and regulations of the SNAP and warned that any

violation would be a cause for immediate dismissal.  Fourth, Criterion 4 may be

satisfied because the evidence shows that it's "ownership was not aware of, did not

approve, did not benefit from, or was not in any way involved in the conduct or

approval of trafficking violations."  7 C.F.R. § 278.6(i).

Based on the foregoing, partial summary judgment will be granted Defendant

on the fact of the SNAP violations.  Summary judgment will be denied on the failure

to impose a CMP rather than permanent disqualification.  Since summary judgment

will be denied on the failure to impose a CMP rather than permanent

disqualification, a trial must be held on the appropriate sanction to be imposed for

the trafficking violations.  The Court has authority to impose its own sanction.  *See*

7 U.S.C. § 2023(a)(16)("if the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence."). *See also Corder v. United States*, 107 F.3d 595, 598 (8th Cir. 1997)(court modified the CMP amount imposed by the agency).

An appropriate order will issue.


<u>/s/Sylvia H. Rambo</u>
SYLVIA H. RAMBO
United States District Judge


Dated: April 24, 2018